**UNITED STATES of America, Appellee,**

v.

**William H. HOCKRIDGE, Charles Petri and Stephen K. Easton, Appellants.**

Nos. 441, 443, 522, Dockets 77–1243, 77–1258, 77–1285.

United States Court of Appeals, Second Circuit.

Argued Dec. 14, 1977.

Decided March 27, 1978.

754

Irving Anolik, New York City, for appellant Hockridge.

Robert S. Cohen, Lans Feinberg & Cohen, New York City (Deborah E. Lans, New York City, of counsel), for appellant Easton.

Daniel J. Kornstein, New York City, for appellant Petri.

Dominic F. Amorosa, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S.D.N.Y., David W. O'Connor, Richard Weinberg, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before OAKES and VAN GRAAFEILAND, Circuit Judges, and BARTELS, District Judge.[*]

OAKES, Circuit Judge:

The principal issue raised in this appeal is the propriety of the district court's refusal to permit two jurors to impeach a partial verdict. Questions of sufficiency of the evidence with respect to appellant Hockridge, jury bias, adequacy of the conspiracy instructions, purported withholding of evidence by the Government, and erroneous evidentiary rulings are also presented, but each merits only limited discussion.

Appellants Hockridge, Petri and Easton challenge the judgments of conviction entered after an eight-week jury trial in the United States District Court for the Southern District of New York before Dudley B. Bonsal, *Judge.* Under Count One of the indictment all three appellants were convicted of conspiracy[1] (a) to misapply moneys of the Chemical Bank (Chemical), Hockridge's employer, (b) to prepare and submit false financial statements for the purpose of obtaining loans from Chemical and from the Bank of New York, and (c) to make false entries in Chemical's books and reports. They also were found guilty of a substantive count—Count Two—charging misapplication and assisting in the misapplication of approximately $1,145,000 in Chemical funds.[2] Petri, the owner of various shell companies and a borrower from Chemical, was also convicted of substantive Count Eight for preparing a false financial statement of the Oceanic Drug Co. for the purpose of influencing Chemical to loan $75,000 to that company.[3] Hockridge and Easton were acquitted on the Oceanic Drug count, as were all three appellants on Counts Three, Four, Ten through Fourteen, Seventeen, Twenty and Twenty-one. The jury was discharged on February 18, 1977, without having reached verdicts on the remaining counts.[4]

## I. FACTS

From September, 1971, through the middle of June, 1972, Petri borrowed in excess of $1,300,000 from Chemical.[5] On over twenty occasions, loans were made to

---

[*] Of the Eastern District of New York, sitting by designation.

1. 18 U.S.C. § 371.

2. 18 U.S.C. §§ 656, 2.

3. 18 U.S.C. § 1014.

4. On April 12, 1977, Hockridge was sentenced on Count One to nine months' imprisonment and on Count Two to a three-year suspended sentence with probation to commence upon his release from confinement. Petri was sentenced to four years' imprisonment on each of Counts One and Two and two years' imprisonment on Count Eight, all sentences to run concurrently. On June 15, 1977, Easton received six months' imprisonment and a fine of $5,000 on Count One. On Count Two his sentence was suspended and he was given three years' probation to commence following his release from confinement.

5. The $1,300,000 total does not include "rollover" loans. Roll-over loans are those in which the proceeds of a new loan are used, at least in part, to pay off an old one.

worthless corporations owned in whole or in part by a "mini-conglomerate" controlled by Petri known after November 24, 1971, as Cine-Prime Corp. Chemical ultimately lost over $1,100,000 on these loans.

Petri effected his scheme with the assistance of Hockridge who, as an assistant vice president and loan officer at Chemical, used his authority [6] to grant unsecured loans to Petri's corporations. Petri originally enticed Hockridge into the conspiracy by satisfying $35,000 in loans which the latter had previously approved to one Daniel Sheddrick.[7] Petri subsequently paid off $23,000 in overdue personal loans that Hockridge had approved to a codefendant, George Whitney. Petri also remunerated Hockridge more directly by diverting $14,000 of a $75,000 loan Hockridge had approved for one of Petri's companies to Hockridge's checking account in March, 1972.[8] Petri also provided Hockridge with other bribes and gratuities including, but not limited to, stock in Cine-Prime Corp. held by a nominee, a $3,000 mink coat for Hockridge's wife, sexual favors of a woman paid for the purpose, a pool table and golf clubs.

For all but two of the corporate loans approved by Hockridge, Easton, an officer in several of Petri's worthless companies, prepared unsigned corporate financial statements submitted to Chemical. Some of these listed non-existent assets. For example, Cord Automobile Co., acquired in bankruptcy for $100, was shown to have more than $260,000 in assets. One statement, that of Todays Stores Services, was dated even before the corporation was formed. Others were false in various particulars.

## II. DISCUSSION

### A. Sufficiency as to Hockridge

■ Only Hockridge disputes the sufficiency of the Government's proof. Viewing the evidence in the light most favorable to the Government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Falcone*, 544 F.2d 607, 610 (2d Cir. 1976), *cert. denied*, 430 U.S. 916, 97 S.Ct. 1329, 51 L.Ed.2d 595 (1977), we conclude that the evidence supports Hockridge's conviction on both the conspiracy and the substantive counts.

The Government's proof at trial focused on four areas. First, the evidence permitted the jury to find that Hockridge knew that the financial statements submitted on behalf of Petri's corporations were false.[9] Second, the jury properly could have found that Hockridge completed false or fictitious documents in connection with several of the loans.[10] Third, the Government's proof demonstrated that Hockridge knowingly violated the bank's "group credits rule" by approving loans in excess of his credit authority to two or more corporations controlled by the same party without approval of other lending officers. And finally, Hockridge received the substantial bribes

---

6. The ceiling on his authority was $50,000 from September, 1971, to March 6, 1972, and then $75,000 from the latter date to June, 1972, when the scheme was discovered and Hockridge was dismissed.

7. The payment to Sheddrick is revealing. Hockridge approved a $75,000 loan to Oceanic Drug Co. and a $35,000 payment to Cord Automobile Co., two of Petri's companies. Hockridge removed $35,000 from the Oceanic checking account and deposited the moneys in the Cord account. A check was then drawn on the Cord account by Petri and Easton, payable to Sheddrick.

8. The $14,000 payoff was made when Hockridge authorized a $75,000 loan to Todays Stores Services, Inc. Hockridge then approved a $14,000 Chemical check payable to the Central Jersey Bank and Trust Co. where he maintained a bank account. He covered the Chemical check by withdrawing $14,000 from the Todays Stores Services' account.

9. He admonished one witness to "tell Petri and Easton to come down off some of these wild balance sheets."

10. On more than one occasion Hockridge falsely stated that certain loans would be used for working capital or for legitimate business investments when in fact the money was used to pay off personal loans or loans made to other companies.

and gratuities detailed above.[11] Clearly, the evidence was more than sufficient.

### B. *Alleged Jury Bias or Misconduct*

All three appellants assert that the jury was infected with prejudice before the deliberations even began. On the fifth day of an eight-week trial, Juror Number Three reported to the judge that several other jurors had remarked that the defendants were guilty. She noted, however, that the jurors were "not speaking about the case per se," whatever that meant. The district judge proceeded to interview each juror individually in camera. Several said that they had heard nothing of the kind, although six reported that someone had made a passing reference, in jest, to the subject of the defendants' guilt. Each averred that he or she would not form any opinion of guilt or innocence until all the evidence was presented. Each further recognized the necessity of not talking about the case.

■ In treating charges of jury misconduct, the trial judge is accorded broad discretion. *United States v. Panebianco*, 543 F.2d 447, 457 (2d Cir. 1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977); *United States v. Flynn*, 216 F.2d 354, 372 (2d Cir. 1954), *cert. denied*, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955); *see* Note, *The United States Courts of Appeals: 1975–1976 Term Criminal Law and Procedure*, 65 Geo.L.J. 203, 370–71 (1976). A criminal trial is of course no place for bias or prejudice, even "in jest." And faced with the threat of bias, Judge Bonsal acted properly in conducting the in camera interviews. If one juror had been contaminated, the district judge's prompt action could have contained any spread of the taint. *United States v. Torres*, 519 F.2d 723, 727–28 (2d Cir.) ("expeditious" voir dire after defendants seen in handcuffs minimized harm where all jurors but one assured

judge of continuing impartiality; unsure juror excused), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975); *cf. United States v. Lord*, 565 F.2d 831, 837–39 (2d Cir. 1977) (in camera individual interrogation of juror exposed to prejudicial publicity during trial required); *United States v. Pfingst*, 477 F.2d 177, 186 (2d Cir.) (individual jurors examined on exposure to prejudicial publicity), *cert. denied*, 412 U.S. 941, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973); *but cf. United States v. Taylor*, 562 F.2d 1345, 1359–60 (2d Cir.) (omission to conduct individual voir dire where jury may have seen defendants in manacles not plain error), *cert. denied sub nom. Salley v. United States*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977).

■ Likewise, on the basis of the jurors' interview statements, it was not an abuse of discretion to continue the trial upon concluding that the jurors were not prejudiced, a determination which the district judge was in the best position to make. *See United States v. Bando*, 244 F.2d 833, 838 (2d Cir.), *cert. denied*, 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53 (1957); *cf. United States v. Chiarizio*, 525 F.2d 289, 293 (2d Cir. 1975) (factual findings at pretrial suppression hearing are reversible on appeal only if clearly erroneous); 3 C. Wright, *Federal Practice and Procedure* § 678, at 143 (1969) (same).

### C. *Juror Impeachment of Partial Verdict*

Appellants' principal contention is best understood in its specific factual context. The jury began deliberations on Friday morning, February 11, 1977, and continued until 9:30 that evening. Reconvening on Monday morning, February 14, it deliberated until about 6:30 p. m. when the court informed counsel that it would exercise its prerogative under Rule 31(b) of the Federal Rules of Criminal Procedure[12] to ask the

---

**11.** Hockridge's subsequent report to the bank that he had received no "gratuities, payments or secret benefits" from Petri or his group failed to mention the $14,000 payoff, *see* note 8 and accompanying text *supra*, and belied Hock-

ridge's testimony that the transaction was really a loan from Petri to be used to buy stock.

**12.** Rule 31(b) provides:

Several Defendants. If there are two or more defendants, the jury at any time during

jury whether it had reached a partial verdict. The jurors responded affirmatively, announcing their verdict of guilty on Count One. After the jurors were polled, the guilty verdicts were recorded. Deliberations resumed on Tuesday, February 15. At about 5:00 p. m., the judge received a note from Juror Number Four asking to see him, a request with which he did not immediately comply. The following morning at about 9:30 a. m. he received a note from Juror Number Three. She also sought a meeting with the judge, fearing that she had committed "a grave injustice" by rushing into the verdict.

With consent of counsel, the judge conducted an on-the-record in camera interview with Jurors Three and Four. During the questioning both jurors expressed their concern with the partial verdict. Juror Number Three believed that "there was not evidence to make [her] decide that Mr. Hockridge and Mr. Petri were involved in a conspiracy." Juror Number Four expressed doubts about Easton's guilt and indicated that she "felt like [at] the last minute we were railroaded. . . ."[13] The judge reminded the two jurors that he did not want them "ever to surrender [their] honest convictions." Juror Number Three replied that she thought she had done so "because of verbal attack." The judge urged her "to get hardened to that," to "think about this some more," and to consider each defendant separately. He then said:

> its deliberations may return a verdict or verdicts with respect to a defendant or defendants as to whom it has agreed; if the jury cannot agree with respect to all, the defendant or defendants as to whom it does not agree may be tried again.
>
> Fed.R.Crim.P. 31(b). In explicating Rule 31(b), Professor Wright states that
> the jury, at any time during its deliberations, may return one or more verdicts on those counts or defendants on which it is agreed. It may then retire again and resume its deliberations about the remaining charges [citing, inter alia, United States v. Conti, 361 F.2d 153 (2d Cir. 1966), vacated and remanded on other grounds sub nom. Stone v. United States, 390 U.S. 204 [88 S.Ct. 899, 19 L.Ed.2d 1035] (1968)] . . . . In permitting the practice here described, Rule 31(b) is in accord with the prior law [citing, inter alia,

You did come in with a verdict on three of them. I would like you to think about that and resume your deliberations and then we'll see how it goes today with the deliberations and then perhaps after we finish here I will want to see you again.

Juror No. 3: I don't understand what you mean. Continue the deliberating—

The Court: After the jury finishes, I think I will want to see you again and talk again about some of these things that you have told me this morning. But I think it would be wise if both of you could go back with the jurors.

The jurors then resumed deliberations and never again intimated any doubts of appellants' guilt on Count One. Indeed, they acquitted a codefendant on Count One that day. On Thursday, February 17, the jury announced its findings that the three appellants were guilty and a codefendant innocent on Count Two, and that all defendants were not guilty on Counts Three and Four. On the sixth and last day of deliberations, Friday, February 18, the jury announced partial verdicts .of not guilty as to all three appellants on nine more counts with the exception of Petri who was found guilty on Count Eight. The jury was discharged without reaching verdicts on the remaining counts even though there was no indication that it was deadlocked.

In response to formal post-trial motions to set aside the verdicts, Judge Bonsal held that the jurors' in camera interview state-

> United States v. Frankel, 65 F.2d 285 (2d Cir.), cert. denied, 290 U.S. 682 [54 S.Ct. 119, 78 L.Ed. 588] (1933)].
>
> 2 C. Wright, Federal Practice and Procedure § 513, at 368–69 (1969).
>
> A guilty verdict may not be challenged on the basis that the jury is sent back for further deliberations on remaining counts after reaching a verdict on one or more counts. United States v. Barash, 412 F.2d 26, 31–32 (2d Cir.), cert. denied, 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969); McDonald v. Commonwealth, 173 Mass. 322, 329, 53 N.E. 874, 875 (1899).
>
> **13.** She told the court that she had been "attacked incredibly" on the first day of deliberations but agreed with the judge that jury deliberations are often "emotional and high strung."

ments could not affect their verdict on Count One. Alternatively, the judge concluded that the two jurors did not "surrender their honest convictions" in finding the appellants guilty on that count.

Challenging the district judge's adverse ruling, appellants argue vigorously that the statements of the jurors were competent to impeach the verdict on Count One for essentially two reasons. First, the jury had not been discharged, thereby making Rule 606(b) of the Federal Rules of Evidence [14] inapposite. Second, when a juror has surrendered "a conscientious conviction," the verdict must be set aside since it was not unanimous. *Grace Lines, Inc. v. Motley*, 439 F.2d 1028, 1032 (2d Cir. 1971); *see United States v. Pleva*, 66 F.2d 529, 531–33 (2d Cir. 1933); 6A *Moore's Federal Practice* ¶ 59.08[4], at 127–28 (1974).

Neither the cases nor the treatises definitely answer the question whether Rule 606(b) bars the impeachment of a partial verdict by the voluntary and spontaneous testimony of a juror prior to the jury's discharge. In *Vizzini v. Ford Motor Co.*, 72

F.R.D. 132 (E.D.Pa.1976), relied on by the Government, the jury returned a verdict of liability to a civil plaintiff which was recorded, but during deliberations on damages it revealed that the liability verdict was a compromise. The district court let the verdict on liability stand, relying on Rule 606(b), and submitted the question of damages to a new jury. The Third Circuit reversed, 569 F.2d 754 (3d Cir., filed Dec. 16, 1977), but reserved decision on the Rule 606(b) question, holding that the issues of liability and damages were so related as not to permit severability.[15] The appellants' cases are equally inconclusive.[16] Even the leading treatises ignore the relationship between Rule 606(b) and partial verdicts after which a jury continues its deliberations.[17]

To buttress appellants' purported distinction between impeachment of complete verdicts on the one hand and partial verdicts followed by continuing deliberations on the other, they suggest that the interests in protecting freedom of deliberation and freedom from post-verdict annoyance, embarrassment, or harassment are not impli-

**14.** Fed.R.Evid. 606(b) states:

Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

**15.** We note that the level of symbiosis between liability and damages that existed in *Vizzini* ordinarily would not pertain to partial verdicts on separate counts of an indictment.

**16.** In *United States v. Pleva*, 66 F.2d 529 (2d Cir. 1933), the conviction was reversed on appeal where a juror had informed the trial judge while the jury was being polled and before the verdict was recorded that he had voted for conviction because of his own illness. Here, of course, the jurors' statements were made *after*

the verdict on Count One had been recorded. *Grace Lines, Inc. v. Motley*, 439 F.2d 1028 (2d Cir. 1971), is similarly unavailing. A juror's statement *on polling* that she had consented to the verdict in the interests of unanimity was insufficient to show surrender of an honest conviction. *Id.* at 1032 (Anderson, *J.*); *id.* at 1033–34 (Lumbard, *J.*, concurring). *See* 6A *Moore's Federal Practice* ¶ 59.08[4], at 130 (1974). Many cases in this circuit state the usual rule that jurors' statements received *after* discharge may not be received to impeach the verdict. *E. g., United States v. Grieco*, 261 F.2d 414, 415 (2d Cir. 1958) (per curiam) (juror intimidated by "blustering arrogance" of another juror), *cert. denied*, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959); *Rotondo v. Isthmian S.S. Co.*, 243 F.2d 581, 583 (2d Cir.) (post-discharge statements explaining reasons for verdict are incompetent), *cert. denied*, 355 U.S. 834, 78 S.Ct. 53, 2 L.Ed.2d 45 (1957).

**17.** *See* 6A *Moore's Federal Practice, supra* note 16, ¶ 59.08[4], at 123–52; 3 J. Weinstein & M. Berger, *Evidence* §§ 606[01]–[05], at 606–1–46; 8 Wigmore, *Evidence* §§ 2345–56 (McNaughton rev. ed. 1961); Wright, *supra* note 12, § 554, at 488–95; *The ABA Standards Relating to Trial by Jury* § 5.7 (Approved Draft 1968) [hereinafter ABA Standards].

cated when the impeaching statements or incidents both occur and are inquired into by the court before the jury has been discharged.[18] Appellants' position, however, is defective for two reasons. First, it mischaracterizes the impeachment of partial verdicts as not implicating the jury's freedom of deliberation. And second, it overlooks another important interest served by the rule against verdict impeachment—verdict finality.

While the freedom of jury deliberations is less threatened by impeachment of partial verdicts than by impeachment of verdicts generally, it is, nevertheless, clearly impinged. The inquiry requested by appellants in this case is a prime example. It would have necessitated scrutiny of the deliberations of the jury including the mental processes of the jurors, a result inconsistent with the strictures of Rule 606(b). The legislative history of Rule 606(b), while perhaps not determinative, reveals the strong congressional purpose of protecting the jury deliberation process. The House version embodied a suggestion of the Advisory Committee of the Judicial Conference to delete the proscription against testimony on "any matter or statement occurring during the course of the jury's deliberations," previously adopted by the Supreme Court. It retained the prohibition against inquiry into the mental processes of the jurors. *See* H.R.Rep.No.93–650, 93d Cong., 1st Sess. 9–10 (1973). The Senate, however, thought any inquiry into internal deliberations of the jury unsound, and its report, citing *McDonald v. Pless*, 238 U.S. 264, 267, 35 S.Ct. 783, 59 L.Ed. 1300 (1915), called for reinstatement of the proscription. S.Rep.No.

93–1277, 93d Cong., 2d Sess. 13–14 (1974), U.S.Code Cong. & Admin.News 1974, p. 7051. The Senate view ultimately prevailed. Similar considerations seemingly apply to a partial verdict; the policy against intrusion into internal deliberations remains the same. Furthermore, it must be assumed that in enacting the Federal Rules of Evidence Congress did not act in a vacuum, but rather had in mind the Federal Rules of Criminal Procedure, including Rule 31(b).

Appellants' position also fails to recognize the important interest in verdict finality which is furthered by Rule 606(b). Finality obviously would be enhanced by extending the rule against impeachment to partial verdicts which have been recorded. A partial verdict should be given final effect since "[i]t would only promote irresponsible hesitation to tell [the jury] that they must reserve their decision altogether until they got through; the appellants had no right in [the jury's] subsequent vacillations." *United States v. Cotter*, 60 F.2d 689, 690 (2d Cir.) (L. Hand, *J.*), *cert. denied*, 287 U.S. 666, 53 S.Ct. 291, 77 L.Ed. 575 (1932). The reason for taking a partial verdict is apparent in cases where there has been a long trial and there exists the prospect of long deliberations. By taking a partial verdict, the court is able to hedge against the possibility of juror illness or death or prejudice by publicity. Of course, finality is not sought for its own sake. But where a partial verdict has been recorded, we perceive no reasons of sufficient magnitude to depart from the normal rules governing impeachment of jury verdicts.[19] A

---

18. Wigmore noted in a non-partial verdict context that "the dangers of uncertainty and of tampering with the jurors to procure testimony, disappear in large part if such investigation as may be desired is *made by the judge* and takes place *before the jurors' discharge* and separation." 8 Wigmore, *supra* note 17, § 2350, at 691 (emphasis in original). *See* ABA Standards, *supra* note 17, § 5.7(a), at 173. Wigmore points out, however, the danger of abuse from an overactive judge attempting to browbeat a jury out of its sincere conclusion, as in *Rex v. Shipley*, 21 How.St.Tr. 847, 950n, 951 (1784). Wigmore, *supra*, § 2350, at 692.

19. A partial verdict still requires the affirmative act of assenting to a verdict either by express answer to the clerk at polling in open court or by silence which implies assent. *See* 8 Wigmore, *supra* note 17, § 2355, at 717. "The record of a verdict implies a unanimous consent of the jury, and is conclusive and incontrovertible evidence of the fact." *Grinnell v. Phillips*, 1 Mass. 529, [530], 542 (1805). Although here there was no individual polling, none was requested. Appellants, therefore, waived the right. *See Humphries v. District of Columbia*, 174 U.S. 190, 194–95, 19 S.Ct. 637, 43 L.Ed. 944 (1899); *United States v. Dye*, 61 F.Supp. 457,

recorded partial verdict ought not to be disturbed absent a showing of the type which would permit impeachment of a complete verdict.

■ In this particular case Judge Bonsal entered into a discussion with the two jurors which to some extent implied that they might, along with the other jurors, reconsider the recorded verdict. To the extent that this may have been error, it was harmless.

■ After the in camera interviews with Judge Bonsal, the two jurors joined the others in verdicts of guilt and innocence on a number of counts. At no point did they again voice any reservation with respect to appellants' conviction on Count One. The appellants argue that Judge Bonsal's conduct in dealing with the two jurors had the effect of coercing them into giving up reasonable doubts they may have had about appellants' guilt in subsequent deliberations. This contention might have some merit if Judge Bonsal's in camera conduct had in any way been coercive, but his management of this difficult and novel situation was the opposite of coercive.[20] We emphasize, however, that in the future the appropriate action of the trial judge faced with a similar request by a juror to reconsider a

prior recorded partial verdict should be to advise the juror simply that such a verdict is final, avoiding the discussion engaged in here.

### D. *Other Issues*

■ Appellants' remaining contentions require scant comment. Hockridge asserts that the Government failed to reveal an ongoing investigation of a "money-washing" operation in several Chemical branches in violation of *Brady v. Maryland*.[21] The inquiry centered on Chemical's failure to comply with federal currency requirements. How this entirely unrelated investigation would have tended to create a reasonable doubt of Hockridge's guilt is not demonstrated. Absent such a showing, no new trial is required. *United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

■ Hockridge argues that the court failed adequately to explain to the jury the "thrust of the conspiracy count," Brief for Appellant Hockridge at 34, urging that he was at most a "casual facilitator," *id.* at 28. *See United States v. Hysohion*, 448 F.2d 343, 347 (2d Cir. 1971). We find that the judge's conspiracy charge[22] was proper un-

---

459 (W.D.Ky.1945); ABA Standards, *supra* note 17, § 5.5; *cf. Hernandez v. Delgado*, 375 F.2d 584 (1st Cir. 1967) (no violation of due process to infer waiver of right to poll jury from silence).

**20.** Concededly, the district judge's directions to the two jurors were somewhat ambiguous. *Ante* at 2141. If he was urging the jurors to deliberate further on Count One, we believe that under the view we have taken of Rule 606(b)'s application to partial verdicts, the district judge exceeded his authority. Appellants could not complain of that error, however, since it was favorable to their position.

In any event, Judge Bonsal's instructions were clearly noncoercive. True, he did not discuss the matter further with the jurors, as he told them he would do. But there did not appear to be any need for additional communications as the jury deliberations progressed. Moreover, although appellants moved to set aside the verdict and for a mistrial when counsel were informed of the colloquy between the judge and the two jurors, no objection to the judge's failure later to discuss the verdict was ever lodged, nor did appellants ever request

redeliberation by the entire jury on Count One. Accordingly, they would have to abide the result reached here even if the recorded partial verdict was not, by virtue of the trial judge's discussion with the two jurors, entitled to final effect.

**21.** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**22.** The court charged that "a conspiracy is a combination or partnership, if you will, of two or more people to violate the law . . . ." It also charged that the Government must prove

that at least two or more persons came to a mutual understanding for the purposes of accomplishing the unlawful plan or scheme described in the conspiracy count which I just read to you. Here, of course, the fact that the defendants knew each other or may have associated with each other or may have discussed mutual or common business interests, that isn't enough to establish a conspiracy. Mere association isn't enough.

der the authorities in this circuit [23] and that the evidence was clearly sufficient to implicate Hockridge as a participant in the scheme to defraud the bank.

■ Easton contends that the court improperly permitted proof of extraneous crimes committed by himself and Petri. Specifically the Government offered proof to show that Easton and Petri failed to withhold requisite taxes from corporate employees. However, this evidence tended to show how the conspiracy operated by suggesting that the Petri corporations were simply shells formed to obtain loans. As such the evidence was plainly admissible under Federal Rule of Evidence 404(b),[24] without creating undue prejudice, confusion or waste of time so as to be excludable under Rule 403.[25]

■ Easton also complains that the Government was erroneously permitted to cross-examine him on the increase of his net worth by over $2,000,000 between 1972 and 1974. But he cannot complain now where he failed to object to this line of inquiry at trial. *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir.), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 277 (1977). Moreover, there was proof that some of the Chemical loan proceeds were diverted to his personal checking account, although he denied this for the most part. Thus the Government could properly inquire into whether he had used Chemical money to finance personal business ventures which culminated in an increase in his net worth. *See United States v. Tramunti*, 513 F.2d 1087, 1105 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Jackskion*, 102 F.2d 683, 684 (2d Cir.), *cert. denied*, 307 U.S. 635, 59 S.Ct. 1032, 83 L.Ed. 1517 (1939).

None of the other points raised by appellants merits discussion.

Judgments affirmed.

23. *E. g., United States v. Rosenblatt*, 554 F.2d 36 (2d Cir. 1977); *United States v. Kahaner*, 317 F.2d 459, 474–82 (2d Cir.), *cert. denied*, 375 U.S. 836, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963).

24. Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however; be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowl-

edge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b).

25. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403.