Anthony BOYKINS, Appellant,

v.

UNITED STATES, Appellee.

No. 95–CF–489.

District of Columbia Court of Appeals.

Argued Oct. 16, 1996.

Decided July 31, 1997.

Rehearing Denied Aug. 20, 1997.

Thomas T. Heslep, appointed by Court, for appellant.

Whitney C. Ellerman, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas C. Black, and Stephanie Miller, Assistant United States Attorneys, on the brief, for appellee.

Before WAGNER, Chief Judge, and STEADMAN and KING, Associate Judges.

WAGNER, Chief Judge:

The principal issue raised by this appeal, one of first impression in this jurisdiction, is whether prior to final discharge of a jury, its partial verdict of guilty on one of several counts may be impeached after it has been announced in open court and confirmed by poll. We conclude that, under the circumstances presented, such a verdict may not be impeached; therefore, the trial court properly gave final effect to the jury's partial verdict. Finding no instructional error, as claimed in Boykins' second argument for reversal, we affirm.

## I. *Factual Background*

Appellant, Anthony Boykins, was indicted for first-degree premeditated murder while armed (Murder I W/A) (D.C.Code §§ 22–2401, –3202) (1996); assault with intent to kill while armed (AWIK–W/A) (D.C.Code §§ 22–501, –3202) (1996); carrying a pistol without a license (CPWL) (D.C.Code § 22–3204(a)) (1996); and possession of a firearm during a crime of violence or dangerous offense (PFCV) (D.C.Code § 22–3204(b)) (1996). Following a jury trial, Boykins was found not guilty of Murder I W/A, but guilty of AWIK–W/A and the lesser-included offense of second-degree murder while armed. After further deliberations, the jury was unable to reach a verdict on the remaining counts, and the trial court granted the government's motion for a mistrial as to the unresolved counts. The trial court denied Boykins' motion for a new trial, and he appealed.

## A. *The Shooting*

At trial the evidence showed that on the evening of June 12, 1994, Boykins, who was riding with three other men in a white convertible, fired a gun at a group of men who were congregated in front of the Amsterdam apartment building in the 1300 block of Fairmont Street, N.W. Antonio Watson, who was in front of the Amsterdam at the time, died as a result of gunshot wounds he sustained. A thirteen-year old, Steven Robinson, sustained three bullet wounds to his leg. Two eyewitnesses testified that they recognized Boykins that evening and that he fired the weapon from the car. One of the witnesses heard Boykins tell Tayon Glover, the younger brother of Boykins' best friend, to "watch out" before he started shooting. A third witness, who did not know Boykins, described the shooter by his clothing and his position behind the driver in the convertible, which was consistent with the testimony of the other two eyewitnesses.

The government introduced into evidence Boykins' video-taped statement which he gave to the police after his arrest on June 28, 1994. According to Boykins, the shooting was one of a series of incidents related to a feud between two groups who identified themselves with the neighborhoods located in the 1300 block of Fairmont Street (the "Fairmont group") and at the 3500 block of 14th Street (the "35 group"). Boykins had been shot on September 21, 1993, allegedly by someone from the 35 group, and there was a rumor that he planned to retaliate against them. According to Boykins, he went to the 35 group and explained that the rumors were not true, and he thought that peace had been achieved. However, a series of violent events occurred subsequently, including the murder of Boykins' best friend and a shooting at Boykins' house.

Boykins learned that "Neck–Neck," a member of the Fairmont group, was responsible for the shooting at his house. Boykins approached Harvey, one of the Fairmont group, told him, "I heard Neck–Neck shot up my house, Young. That's messed up. You all done got me in it. Now my family in it.... Now—it's—its in the air, man. You all—you all—it's just out of hand now. It's not in my hands no more."

On the day of the drive-by shooting which led to the charges in this case, Boykins received a telephone call from a man named Marquette who reported about a hostile encounter that day with some of the Fairmont group. Boykins offered to take Marquette and others down to the Fairmont group and try to "squash it," which apparently meant to talk to them in an effort to avoid further violence between the two groups. However, Boykins told Marquette, "If they can't squash it like that, man, it's just—you all going to have to do what you all got to do, man." He told the detective that he planned to await Neck–Neck's release from jail to confront him and that he did not intend to take it out on Neck–Neck's friends.

Boykins admitted that he and three men drove a white convertible in front of the Amsterdam apartment building that same evening. Boykins stated that although he did not see any guns, he knew that his companions were armed and told them so. Before going to Fairmont Street, he told them:

> Man, I know you all don't feel safe going down here. I probably know you all got guns. But, Young, you all hold you all's gunfire, Young'un, until—you know, we going to try to get it squashed. If somebody shoot at you all—you know, if they don't want to squash it, we just—you all just do what you all—do what you all got to do.

Boykins testified at trial essentially as he did in his video-taped statement. He claimed that he was about to get out of the car when he heard a gunshot, and "I just seen Fairmont looked—they started running." Boykins sustained a head wound during the shooting.

## B. *Jury Deliberations and Return of the Verdicts*

The jury began deliberations on the afternoon of February 21, 1995, and they were excused for the day at approximately 4:00 p.m. After deliberating all morning the following day, the jury sent a note which read, "Does 'assault with intent to kill' on Steve Robinson apply to conscious disregard?" Af-

ter conferring with counsel, the court responded with a note to the jury, explaining that "conscious disregard" applied only to the charge of second-degree murder.[1]

During the afternoon, the court learned that the mother-in-law of one of the jurors had died. The court discussed with counsel whether a partial verdict should be taken. Both sides agreed that the jury should continue to deliberate and that the question of taking a partial verdict should be deferred until the next day. The jury sent a second note that afternoon which reported that they could not agree on the charge of assault with a dangerous weapon and that they "requested a mistrial." The court inquired whether the jury had reached a unanimous verdict on any of the charges. The jury reported that it had reached unanimous verdicts on counts 1.a (Murder I W/A), 1.b (Murder II W/A), 1.c (voluntary manslaughter while armed), and 2.a (AWIK–W/A).

The court inquired in open court of the foreperson whether the jury had reached a unanimous verdict as to some of the charges, and the foreperson stated that they had. The foreperson delivered the verdict of not guilty for both Murder I and Murder II. Another juror stated immediately, "second degree is guilty," and others appeared to nod in agreement. The trial court inquired whether the foreperson had the verdict form, and he said that he did not. The court requested that the jury return to the jury room, look at the verdict form and "make sure that you all agree as to what your verdict is."

When the jury returned to the courtroom, the court stated that it wanted to start all over "to make absolutely certain" about the verdict. The jury again delivered a verdict of not guilty as to Murder I, but guilty as to Murder II. At a bench conference, the court discussed with counsel for the parties the jury's earlier report that it had also reached a verdict on the charge of voluntary manslaughter while armed. Defense counsel agreed with the court that the jury should

return to the jury room because they had been instructed not to consider the lesser included manslaughter count if they reached a verdict of guilty on the greater offense of second-degree murder. The court then instructed the jury again that it should consider the manslaughter count only if they found the defendant not guilty of the second-degree murder count.

When the jury returned to the courtroom, the court explained that it would begin again the process of taking their verdict. The jury, speaking through its foreperson, returned a verdict of not guilty of Murder I and AWIK–W/A and guilty of the Murder II count. Defense counsel immediately requested a poll of the jury. Each juror confirmed the verdict during the poll. The court excused the jurors for the evening with instructions that they return the next morning to continue deliberations. The court explained that it was too soon to conclude that they could not reach a unanimous verdict as to the count on which they had reported an impasse.

The following morning, the jury sent a note, which stated:

> There was some discrepancy on the understanding of charge 1.B [Murder II W/A]. We understand this is serious, but no longer can we agree on the verdict of 1.B. As we deliberated at length on the second charge (a & b) we became aware of the error in full understanding of the charge of 1.B and believe we will not come to a consensus on any of the charges.

The government argued that the partial verdict delivered the day before was final, and that it could not be impeached. Defense counsel argued that the verdict was not unanimous under the circumstances and "to hold to a verdict that this jury ... clearly doesn't agree with would be a violation of [Boykins' rights]". He contended further that the rule favoring verdict finality should not apply because the jury had not yet been discharged, which, he contended, is a critical factor underlying the rule. The trial court

---

1. The court's written response stated in its entirety:

 The phrase "conscious disregard" applies to murder in the second-degree. For assault with intent to kill relating to Steve Robinson, you must find specific intent to kill, not "conscious disregard." You are directed to jury instruction 4.03 [assault with intent to kill].

held that the partial verdicts were final and that the rule against impeachment of a jury's verdict applies.

As to the remaining counts, the government moved for a mistrial. After lengthy arguments addressing the finality or lack of finality of the partial verdict and the appropriate course in light of the status of the case, defense counsel stated that he would take no position on the government's motion for mistrial, but that he did not oppose it. Having concluded that the jury's notes indicated that "there's no reasonable likelihood that [the jury] will reach a unanimous verdict on the remaining counts," and the lack of opposition to the government's motion, the trial court granted the motion for mistrial and discharged the jury.

Boykins filed a timely motion for a new trial pursuant to Super. Ct.Crim. R. 33. In support of his motion, he attached an affidavit from a juror stating that "[m]y vote of guilty on second degree murder was a mistake." The juror explained that her mistake was caused by a misunderstanding of the jury instructions. By written order, the trial court denied the motion, concluding, as it had in its prior ruling, that the partial verdict was final and that the juror could not impeach it.

**II.** *Impeachment of Partial Verdict*

■ Boykins argues that the trial court should have permitted the jury to reconsider its verdict of guilty on the second-degree murder charge, "since the jury's notes clearly expressed lack of unanimity on the charge." He contends that the policies underlying the rule against impeachment of a jury's verdict are not impinged where the jury repudiates its partial verdict while still deliberating on the remaining charges. We review first the non-impeachment rule and the interests it protects and then its applicability to the circumstances presented in this case.

■ It is well settled that a jury's final verdict may not be impeached by matters that inhere in the verdict. *Sellars v. United States,* 401 A.2d 974, 981 (D.C.1979) (citing *Hyde v. United States,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912)); *see also Wilson v.*

*United States,* 663 A.2d 558, 562 n. 5 (D.C. 1995); *United States v. Stansfield,* 101 F.3d 909, 913 (3rd Cir.1996). Under this non-impeachment rule, even when information about the jury's decisional processes is volunteered by a juror, it is incompetent to impeach a final verdict on such matters as mistake of law, misapprehension of the testimony, and unsound reasoning by the jurors. *Domeracki v. Humble Oil & Refining Co.,* 443 F.2d 1245, 1247–48 (3rd Cir.1971) (the failure of the jury to follow the court's instructions is not grounds for impeachment of jury's verdict); *Sellars, supra,* 401 A.2d at 982 (misunderstanding of instructions is not a basis for impeachment of jury verdict) (citations omitted); *Queen v. D.C. Transit System, Inc.,* 364 A.2d 145, 149 (D.C.1976) (jury's erroneous reasoning not a basis for overturning its verdict). Such jury reasoning "is regarded as inhering in a verdict," and for sound policy reasons may not be used to impeach a verdict duly rendered. *Sellars,* 401 A.2d at 981–82. Among the reasons for the rule are: "(1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and open discussion among jurors; (3) reducing incentives for jury tampering; (4) promoting verdict finality; and (5) maintaining the viability of the jury as a judicial decision-making body." *Id.* (quoting *Virgin Islands v. Gereau,* 523 F.2d 140, 148 (3d Cir.1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976)).

■ Boykins argues that these policy reasons are not implicated where the jury has returned only a partial verdict and has not been discharged finally. However, whether the jury has been discharged is not the critical factor in determining verdict finality. "A verdict becomes immutable by the jury once announced in open court, or when it has been confirmed by a poll, if ordered." *United States v. Dakins,* 872 F.2d 1061, 1065 (D.C.Cir.1989); *see also Queen, supra,* 364 A.2d at 148–49.

A similar argument was considered and rejected by the Court of Appeals for the Second Circuit. *See United States v. Hockridge,* 573 F.2d 752 (2d.Cir.1978). In *Hock-*

*ridge*, the jury returned a partial verdict of guilty on one count, which was confirmed by poll and recorded before the jury resumed deliberations on the unresolved counts. 573 F.2d at 756–57. Later, the court received notes from two jurors. One juror stated that the evidence was insufficient to convict Hockridge and a co-defendant, Charles Petri; the other juror stated that she was doubtful of co-defendant, Easton's guilt and felt that she had been "railroaded" to convict. *Id.* at 757. With a brief instruction to the two jurors at an *in camera* hearing, the court allowed the jury to resume deliberations on the remaining counts as to the three appellants as well as another defendant. *Id.* Subsequently, the jury acquitted appellants on two of the remaining counts, found them guilty of an additional count, and found another co-defendant not guilty on the count for which it had returned the partial verdict. The jury was discharged without reaching verdicts on other counts. Significant for the case before this court, the *Hockridge* court addressed whether the policy reasons for the non-impeachment rule apply to partial verdicts.

The *Hockridge* court decided, and we agree, that at least two important policy objectives of the non-impeachment rule are furthered by the rule's application to partial verdicts, specifically, verdict finality and freedom in jury deliberations.[2] *Id.* at 759; *accord, Dakins,* 872 F.2d at 1065. While acknowledging that "the freedom of jury deliberations is less threatened by impeachment of partial verdicts," the Second Circuit concluded that such freedom is encroached upon nevertheless. *Id.* An inquiry into the reservations expressed by the jurors, the court

concluded, would require delving into the jurors' mental processes, an action inconsistent with Fed.R.Evid. 606(b). *Id.*

Protection of the jury's decisional processes is precisely what the non-impeachment rule is intended to achieve. *Domeracki, supra,* 443 F.2d at 1248. "If evidence [obtained from jurors] could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." *Id.* (quoting *McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 784–85, 59 L.Ed. 1300 (1915)). The policy against such intrusions into the deliberative process are of like concern when the jury returns a partial verdict. *Hockridge, supra,* 573 F.2d at 759. Delving into the intrinsic influences which shaped the jury's decision would expose thoughts of the jury which were intended to remain private. Therefore, we are persuaded that encouraging open discussions among jurors is a sound policy reason for precluding impeachment of partial verdicts.

Boykins seeks to distinguish this case from *Hockridge,* contending that no inquiry of any particular juror was required when the jury attempted to reconsider or impeach its partial verdict. He contends that it would have been sufficient for the court to instruct the jury at that point simply "to continue deliberations on unresolved counts." Essentially, this is an argument to treat a partial verdict as a tentative one until the jury is discharged finally. Such an approach would eviscerate Super. Ct.Crim. R. 31(b), which allows the jury to return a verdict on any count or counts to which it has agreed.[3] If a partial

---

2. The Second Circuit's decision was based on the Federal Rules of Evidence 606(b), which states:

 Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affida-

 vit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

3. Rule 31(b) of the Superior Court criminal rules reads as follows:

 *Several defendants.* If there are 2 or more defendants or if there are 2 or more counts, the jury at any time during its deliberations may return a verdict or verdicts with respect to a defendant or defendants as to whom it has agreed or with respect to a count or counts as to which it has agreed; if the jury cannot agree with respect to all, the defendant or defendants as to whom it does not agree or the count or

verdict remained open for further consideration by the jury, there would be no incentive for obtaining a partial verdict, and it would serve no useful purpose to the court or the parties. Partial verdicts, which are final, provide a "hedge against the possibility of juror illness or death or prejudice by publicity," particularly where there has been a lengthy trial. *Hockridge, supra,* 573 F.2d at 759. In this case, there had been a concern that one of the jurors might have to be excused because of a death in the family. That potential is always present, particularly for a lengthy trial, including deliberations, after the alternates have been excused. It is desirable that a case be decided once heard, and the partial verdict serves that end.

Another policy reason clearly implicated for application of the non-impeachment rule to partial verdicts is verdict finality. *Hockridge, supra,* 573 F.2d at 759; *see Sellars, supra,* 401 A.2d at 981–82. Boykins' argument ignores the rule that a verdict is final once announced in open court and confirmed by poll, when requested. *Queen, supra,* 364 A.2d at 149; *Dakins, supra,* 872 F.2d at 1065. Given the verdict's finality, there is no reason that it should be set aside for reasons other than those for which any other final verdict is subject to challenge. *See Hockridge,* 573 F.2d at 759–60.

The important interest of verdict finality is maintained by the rule against impeachment of verdicts, partial and complete. *Hockridge, supra,* 573 F.2d at 759. Finality is jeopardized where a verdict once rendered remains subject to reconsideration. *See Dakins, supra,* 872 F.2d at 1065. Boykins argues that it is fundamentally unfair for a criminal conviction to stand where the jury makes known that it is no longer unanimous. This competing consideration has been analyzed in the context of complete final verdicts and rejected as a basis for overturning the jury's final verdict. After the final verdict, there is no fundamental right to the jury's "subsequent vacillations." *Hockridge,* 573 F.2d at 759–60 (quoting *United States v. Cotter,* 60 F.2d 689, 690 (2d. Cir.), *cert. denied,* 287 U.S. 666, 53 S.Ct. 291, 77 L.Ed. 575 (1932)).

In this case, the jury reached a unanimous verdict of conviction on the second-degree murder count. The trial court went to exceptional lengths to assure that the verdict was unanimous, providing the jury with three opportunities to reconsider, and the jury confirmed its unanimity before the verdict was taken finally. Once the verdict had been rendered and each of the jurors assented to it during the poll, it became a final verdict. *Dakins, supra,* 872 F.2d at 1065. Therefore, the court properly declined to allow the jury to reconsider the verdict. *Id.; see also Queen, supra,* 364 A.2d at 149.

### III. *Motion for New Trial*

Boykins argues that the trial court abused its discretion by denying his motion for a new trial. He contends that, "there was not unanimity on the jury as to the facts of the case," and, therefore, the court "should have granted the motion for new trial because that was the only fair and just thing to do." This argument is essentially the same as the one considered and resolved in the preceding section of this opinion.

■ The trial court's denial of a motion for a new trial will not be disturbed absent a clear showing of abuse of discretion. *Derrington v. United States,* 488 A.2d 1314, 1339 (D.C.1985) (citations omitted), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988). We find no abuse of discretion here. *See Johnson v. United States,* 398 A.2d 354, 363 (D.C.1979). The trial court correctly found that the jury's guilty verdict on the charge of second-degree murder was final. As such, it could not be impeached by a juror's affidavit; therefore, Boykins was not entitled to a new trial. *Sellars, supra,* 401 A.2d at 982 (Jurors may not impeach their verdict because they misunderstood the instructions.); *Queen, supra,* 364 A.2d at 148 ("A single juror cannot be heard to impeach the verdict of the whole jury.") Therefore, we find no abuse of discretion in the trial court's ruling. *See Wilson v. United States,* 663 A.2d 558, 559–60 (D.C.1995).

counts as to which it does not agree may be tried again.

## IV. Claim of Instructional Error

 Boykins argues that the trial court erred in denying his request for an instruction on criminal negligence involuntary manslaughter as a lesser-included offense of the murder charge.[4] He contends that this conduct falls within the elements of the offense of criminal negligence manslaughter. *See Comber v. United States*, 584 A.2d 26, 48–49 (D.C.1990). Under that theory, "one who unintentionally causes the death of another as a result of non-criminal conduct is guilty of involuntary manslaughter only where that conduct both creates 'extreme danger to life or of serious bodily injury,' and amounts to 'a gross deviation from a reasonable standard of care.'" *Id.* (quoting *Faunteroy v. United States*, 413 A.2d 1294, 1298–99 (D.C.1980)). The difference between risk-creating activity sufficient to sustain a murder conviction and a criminal manslaughter conviction lies in whether the actor is aware of the risk or should have been. *Id.* at 49. As a predicate for the instruction, Boykins points to his trial testimony and video-taped statement which showed that he had taken his companions, whom he knew might be armed, into a confrontational situation.

 A lesser-included offense instruction is warranted when "(1) all elements of the lesser offense are included within the offense charged, and (2) there is a sufficient evidentiary basis for the lesser charge." *Rease v. United States*, 403 A.2d 322, 328 (D.C.1979) (citations omitted). Manslaughter is a lesser-included offense of second-degree murder. *See Stewart v. United States*, 383 A.2d 330, 332 (D.C.1978). However, Boykins cannot meet the second prong of *Rease*, a sufficient evidentiary basis. The require-

ment of a sufficient evidentiary basis can be met by a showing that: (1) "there is conflicting testimony on the factual issue," or (2) the lesser-included offense is fairly inferable from the evidence, including a reconstruction of the events gained by accepting all or some of the testimony of some or all witnesses. *(Thomas) Robinson v. United States*, 388 A.2d 1210, 1213 (D.C.1978). This requirement is a minimal one; it means some evidence, "however weak." *Rease, supra*, 403 A.2d at 329. "That is to say, the *weight* of the evidence supporting the instruction is immaterial; as long as a jury could rationally convict on the lesser-included offense after crediting the evidence, the court must give the instruction no matter how inclined it might be to discount that evidence." *Shuler v. United States*, 677 A.2d 1014, 1017 (D.C. 1996). Where a verdict on the lesser offense would be irrational, or require the jury to undertake a "bizarre reconstruction of the evidence," the instruction is not warranted. *See id.; see also Wood v. United States*, 472 A.2d 408, 410 (D.C.1984).

 "In this jurisdiction, a homicide constitutes voluntary manslaughter when the perpetrator kills with a state of mind which, but for the presence of legally recognized mitigating circumstance, would render the killing murder." *Comber, supra*, 584 A.2d at 42. It is an "unlawful killing, intentionally committed, the requisite intent being the intent to do the act which caused the death rather than a specific intent to cause death." *United States v. Bradford*, 344 A.2d 208, 214 (D.C.1975). "Involuntary manslaughter is an unlawful killing which is unintentionally committed." *Bradford, supra*, 344 A.2d at 215 (footnote omitted). The intent necessary to prove criminal negligence involuntary man-

---

4. The government contends that Boykins did not request the instruction. The record is somewhat equivocal on this point. Boykins raised the issue with the court, and there followed some discussion concerning the applicability of the instruction to the facts of this case. At one point, defense counsel stated he had decided not to request the instruction. Subsequently, the court stated that it did not think that the evidence supported the instruction, and defense counsel stated that the court was probably right. Later, however, defense counsel stated that he was thinking about the instruction, but there does not appear to be any further discussion of the issue

in the record. We have noted that whether to request instruction on a lesser-included offense is a question of tactics for trial counsel to decide, and that where no such request is made, it is properly omitted by the trial court. *Bostick v. United States*, 605 A.2d 916, 920 & n. 13 (D.C.App.1992). *See also Smith v. United States*, 686 A.2d 537, 546 n. 9 (D.C.1996); *(Troy) Robinson v. United States*, 649 A.2d 584, 586 n. 3 (D.C.1994). We need not resolve this issue, for even assuming that Boykins requested the instruction, he cannot prevail on the claim of instructional error.

slaughter is a "lack of awareness or failure to perceive the risk of injury from a course of conduct under circumstances in which the actor should have been aware of the risk." *Id.* Thus, where the accused was aware of the risk of harm, but acted in conscious disregard of it, the killing is murder or voluntary manslaughter, and where the accused is not aware of the risk of harm, but should have been, the killing will be involuntary manslaughter. *See Brown v. United States,* 619 A.2d 1180, 1183 (D.C.1992); *Comber,* 584 A.2d at 48–49.

In this case, Boykins failed to set forth an evidentiary basis for a finding that he was not aware of the risk of harm. Indeed, the evidence is to the contrary. Boykins argues that the instructions should have been given because he admitted "that he had taken men whom he knew were possibly armed into a tense, confrontational situation," and that his testimony implied that he may have caused the shootings unintentionally. We disagree. Here, Boykins admitted that there was a longstanding feud, that violence might erupt and that, in that event, his cohorts would have to do what they had to do. This evidence shows that Boykins was aware of the risk of violence in taking the group to Fairmont Street. Boykins would have been entitled to an instruction on involuntary manslaughter only if there was some evidence that he was *not* aware that taking the men to Fairmont Street could lead to violence. *See Brown, supra,* 619 A.2d at 1183. Therefore, even assuming Boykins clearly requested the instruction, the trial court did not err in declining to instruct on involuntary manslaughter.

For the foregoing reasons, the judgment of conviction appealed from hereby is

*Affirmed.*