Van Quinton LEAK, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–570.

District of Columbia Court of Appeals.

Argued Jan. 4, 2000.

Decided Aug. 3, 2000.

Clinton R. Pinyan, appointed by the court, with whom Robert H. Klonoff, appointed by the court, Washington, DC, was on the brief, for appellant.

Alex J. Bourelly, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher and Mary Patrice Brown, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, FARRELL, and GLICKMAN, Associate Judges.

STEADMAN, Associate Judge:

Appellant picked up and rode away on a bicycle that had fallen to the street while the true owner, wearing a bicycle helmet, and an assailant were struggling close by. He was convicted of robbery. On appeal, he argues that the trial court erred in refusing to instruct the jury on the lesser-included offense of theft and that the denial of his request for a continuance to retain new counsel on the eve of trial was an abuse of discretion. Finding no error on either basis, we affirm.

## I.

### A.

The standards for our review are well-established. "A lesser-included offense instruction is proper where (1) the lesser included offense consists of some, but not every element of the greater offense; and (2) the evidence is sufficient to support the lesser charge." *Woodard v. United States*, 738 A.2d 254, 261 (D.C. 1999) (quotation omitted). "This evidentiary requirement can be met in one of two ways: (1) where there is conflicting testimony on the factual issue, and (2) where the lesser included offense is fairly inferable from the evidence including a reconstruction of the events gained by accepting testimony of some or all of the witnesses even in part." *Price v. United States*, 602 A.2d 641, 644 (D.C.1992) (quotations omitted). The lesser included instruction, however, is only required where, based on that evidence, "a jury could rationally convict on the lesser-included offense." *Bright v. United States*, 698 A.2d 450, 457 (D.C. 1997) (quoting *Shuler v. United States*, 677 A.2d 1014, 1017 (D.C.1996)). Thus, "[w]here a verdict on the lesser offense would be irrational, or require the jury to undertake a 'bizarre reconstruction of the evidence,' the instruction is not warranted." *Boykins v. United States*, 702 A.2d 1242, 1250 (D.C.1997) (quoting *Shuler, supra*, 677 A.2d at 1017); *see also Smith v. United States*, 686 A.2d 537, 545 (D.C. 1996), *cert. denied*, 522 U.S. 839, 118 S.Ct. 115, 139 L.Ed.2d 67 (1997).

The definitions of the relevant crimes must, of course, also shape the analysis. An individual commits the offense of theft "if that person wrongfully obtains or uses

the property of another with intent: (1) To deprive the other of a right to the property or a benefit of the property; or (2) To appropriate the property to his or her own use or to the use of a third person." D.C.Code § 22–3811(b) (1996). An individual commits robbery when "by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, [he or she] take[s] from the person or immediate actual possession of another anything of value." D.C.Code § 22–2901 (1996).

 There is no dispute here that theft is a lesser included offense of robbery. *Ulmer v. United States,* 649 A.2d 295, 297 (D.C.1994). Moreover, the appellant does not contest the sufficiency of the evidence for conviction of the greater charge of robbery. Under these conditions, the exclusion of a theft instruction would only be justified if "a verdict on the [theft] offense would be irrational, or require the jury to undertake a bizarre reconstruction of the evidence." *Boykins, supra,* 702 A.2d at 1250. Therefore, we examine the record to determine whether the evidence presented limited the rational conclusion of the fact-finder to either acquittal or conviction on robbery.

### B.

In this case, there was no eyewitness to the totality of the fast-moving relevant events. The key evidence came in through the testimony of the victim, Matthew Sawalick.[1] The "hard facts" to which he could testify about the event consisted of the following. On December 16, at 9:30 p.m., Sawalick was slowly riding his bicycle on P Street, N.W., near Dupont Circle. The street was crowded with pedestrians and cars. Suddenly, he was attacked from behind and pulled off his bicycle. He was dragged away from the bicycle and kicked, the attack lasting for less than a minute. As Sawalick struggled with his assailant, another man—later identified as appellant—picked up the bike, as it lay just a few feet from the two struggling men, and rode away with it down P Street. Sawalick broke free and gave chase, all the while yelling for help. A near-by police officer heard his cries and caught up with appellant on the victim's bicycle. The other individual, who had initiated the attack, was never identified or apprehended.

Sawalick acknowledged that as far as he could say for sure, he struggled only with the unidentified man, and that appellant never touched him. Both the assailant and the appellant approached from behind, and therefore he did not see whether the two approached together. Indeed, he said nothing of appellant's movements prior to the moment that appellant took the bike. Sawalick said that his bicycle helmet fell over his eyes for a time, which hindered his observation of events. The only direct link between the assailant and appellant was that, according to Sawalick, during the struggle, the assailant told appellant to "take the bike."[2]

Clearly this evidence was sufficient for a conviction of robbery, drawing as we must all inferences in favor of the government, on the basis of the inference that the appellant and the unidentified assailant worked in concert. But in considering this evidence on the issue of the lesser-included offense, we must exercise these same considerations in favor of the appellant. In short, the question here is whether this

---

1. Two other witnesses testified for the government. One was the police officer who saw Sawalick chasing the appellant and who was successful in apprehending him on Sawalick's bicycle. He testified that when apprehended, appellant had said "You set me up." The other witness was a woman who lived on the seventh story of a building overlooking P Street and, responding to Sawalick's shouts, looked out and saw Sawalick getting up from the ground, appellant moving away on the bicycle and a third person standing nearby. Appellant presented no evidence.

2. This statement was apparently made after appellant had already picked up the bike. There was no hearsay or other objection to its admission.

evidence was also susceptible of a reasonable finding only of theft.

The defense theory of the case did not take serious issue with the hard facts presented by Sawalick. It was, in essence, that appellant came upon the scene seeing the two men struggling and the bicycle lying in the street. Appellant picked up the bicycle simply to remove it from the street. As Sawalick chased after him screaming, appellant fled in panic to escape Sawalick, not to steal the bike from him. If believed, this scenario, which did not require the presentation of any additional evidence, would result in an acquittal.

But as our case law indicates, the jury is not bound to accept in full the scenario presented by either side. *Shuler, supra,* 677 A.2d at 1017. Indeed, a defendant has the right to a lesser-included instruction warranted by the evidence even if it is inconsistent with the defendant's theory of the case. *See Bostick v. United States,* 605 A.2d 916, 917 (D.C.1992). Here, the jury could have concluded that the best the evidence showed beyond a reasonable doubt was that appellant came upon two individuals struggling (one of them with a bicycle helmet), saw a bike lying close beside them, and seized the opportunity to take the bike for himself.

Prior to closing arguments, defense counsel requested an instruction on misdemeanor theft because of the undisputed evidence that Leak never assaulted the victim. Counsel argued that attacks on Sawalick's credibility allowed the jury to reasonably discredit his testimony regarding the assailant's purported instruction to Leak and the subsequent inference of a connection between the two men. The trial court denied the requested instruction. The court ruled that there was no evidence on which to support a finding of theft because the appellant was either "totally innocent" or an "aider and abettor in a robbery ... [because] he [took] advantage of the forcible removal of the complainant from the bicycle." Thus, the trial court apparently concluded that even if no prior connection existed between assailant and appellant, the latter nonetheless was guilty of robbery in taking "advantage" of the assailant's use of force to acquire the property.

We need not decide here whether a conviction for robbery, whether as a principal committing the asportation portion of that offense or as an aider or abettor, can rest upon such a proposition. Rather, the question is whether the evidence could have supported a finding that, although appellant illegally possessed the bicycle, he neither participated in a robbery along with the unidentified assailant, nor acted as a principal of a robbery by snatching the bike from the immediate actual possession of the victim. Even if we assume that the appellant did not act in concert with the assailant, we conclude that a rational jury could not find that appellant's taking of the bicycle happened outside the "immediate actual possession" of the victim within the expanded meaning that our statute and case law have given both to the offense of robbery and to that component of the offense.

In distinct contrast to most jurisdictions, the District of Columbia's statutory definition of robbery includes the stealthy snatching of an item, even if the victim is not actually holding, or otherwise attached to the object, or indeed is unaware of the taking. "To satisfy the 'force' requirement in a charge of robbery by stealthy seizure, the government need only demonstrate the actual physical taking of the property from the person of another, even though without his knowledge and consent, and though the property be unattached to his person." *(Earl) Johnson v. United States,* 756 A.2d 458, 462 (D.C. 2000) (citations and quotations omitted). We have consistently and for many years given a broad meaning to the term "immediate actual possession," and have recognized that any taking from the area encompassed by that term is a robbery—not

simply larceny. Furthermore, such possession may continue for purposes of robbery even though the owner is prevented by force from effectively exercising that possession. *See (Phillip) Johnson v. United States,* 686 A.2d 200, 208 n. 1 (D.C. 1996) (" 'immediate actual possession' in the robbery statute ... means 'an area within which the victim could reasonably be expected to exercise some physical control' ") (quoting *United States v. Spears,* 145 U.S.App.D.C. 284, 293, 449 F.2d 946, 955 (1971)); *Head v. United States,* 451 A.2d 615, 624 (D.C.1982) (same); *Rouse v. United States,* 402 A.2d 1218, 1220 (D.C. 1979) ("a thing is within one's 'immediate actual possession' so long as it is within such range that he could, if not deterred by violence or fear, retain actual physical control over it") (citing *United States v. Dixon,* 152 U.S.App.D.C. 200, 204, 469 F.2d 940, 944 (1972)); *Spencer v. United States,* 73 U.S.App.D.C. 98, 116 F.2d 801 (1940) (jury could reasonably find that defendant took wallet from "immediate actual possession" of victim while he was in bed with a prostitute and his trousers containing the wallet sat on a chair in the same room as unknowing victim). Indeed, in *Spencer,* the appellate court deemed "clearly correct" a trial court instruction that an item is in immediate actual possession of a person in circumstances where "if the complainant knew that his property was being removed from his clothes, such knowledge would likely result in physical violence or a struggle for possession of the property." 73 U.S.App.D.C. at 99, 116 F.2d at 802.

■ Here, among the evidence presented, there was no dispute that when appellant took the bike, Sawalick was approximately two feet away.[3] A bicycle lying two feet away from the owner is, undoubtably, within the victim's immediate actual possession as our cases have applied that term, at least where, as here, the owner is aware of the attempted taking in a setting of force and violence.[4] *See, e.g., (Earl) Johnson, supra,* at 462 ("taking [victim's] wallet from the ground, as opposed to [victim's] person" satisfied the elements of robbery); *Giles v. United States,* 472 A.2d 881, 884 (D.C.1984) (evidence was sufficient to prove that property was taken from "immediate actual possession" where defendants stole property from homeowner, while homeowner was physically restrained in the house, despite lack of evidence of the location of the stolen property within the house); *Rouse, supra,* 402 A.2d at 1220–21 (property remained in immediate actual possession of victim even though victim had fled from scene after threats of force or violence); *Spencer, supra,* 73 U.S.App.D.C. at 116, 116 F.2d 801 (wallet in trousers which were hanging on chair were within victim's immediate actual possession). We therefore conclude that a jury finding of guilt on the lesser-included offense of theft without a finding of guilt on the robbery charge would have irrationally ignored the meaning of "imme-

---

**3.** Sawalick testified as follows:

"Q. And sir, your bike was left in the middle of the road? A. Yeah, with me about two feet away from it trying to grab at it so I can get it. I was being pulled away from it. Q. And Mr. Leak then picked up your bike, right? A. Yeah. Q. Then you turned your attention towards him. Right? A. No. No. Absolutely not. My whole focus of attention was on the bike. I didn't want to be one inch away from that bike. I wanted to touch it. I wanted to have it. I didn't want to let it go."

**4.** It is true that in the cases cited, force and violence were effectuated by the defendant or a cohort, but we fail to see any grounds for

distinction under the applicable principles where such dispossession indisputably exists albeit caused by another. Here it was plain that the owner was nearby and appellant acted at his peril if he presumed the struggle was initiated by the owner, contrary to the actual facts. We need not address here the precise dimensions, perhaps more limited, of immediate actual possession in a context where no actual force or violence is involved, and the owner is oblivious of the taking. *Cf., e.g, Harrison v. United States,* 407 A.2d 683, 684–85 (D.C.1979) (appellant properly convicted of robbery, although elderly victim was unaware pickpocket had taken property from his person).

diate actual possession" within the robbery statute, or would have reflected a bizarre reconstruction of the evidence. *Boykins, supra,* 702 A.2d at 1250. The request for the lesser-included instruction was properly denied.

## II.

■ Appellant also argues that the trial court abused its discretion when it denied his request to replace his court-appointed counsel from the Public Defender Service (PDS) with retained counsel. Appellant's request came as his trial was about to begin, and would have granted him his third attorney of the proceedings.[5] Absent evidence that appellant's trial counsel was ineffective, and in light of the questionable merits of appellant's request and the adverse effect on the orderly administration of justice such a substitution would have had, we find appellant's argument unpersuasive.

The operative principles governing our review have been cogently set forth in *United States v. Burton,* 189 U.S.App.D.C. 327, 584 F.2d 485 (1978).

> An accused who is financially able to retain counsel must not be deprived of the opportunity to do so. Yet the right to retain counsel of one's own choice is not absolute. The right cannot be insisted upon in a manner that will obstruct an orderly procedure in courts of justice, and deprive such courts of the exercise of their inherent powers to control the same. The public has a strong interest in the prompt, effective, and efficient administration of justice; the public's interest in the dispensation of justice that is not unreasonably delayed has great force.
>
> ... It is firmly established that the granting or refusal of a continuance is a matter within the discretion of the judge who hears the application and is not subject to review absent a clear abuse. Yet when the continuance is sought to retain or replace counsel, the defendant's Sixth Amendment right to the assistance of counsel is implicated....
>
> The evaluation of appellant's need for additional counsel, and the balance between the right to select counsel and the public's interest in the orderly administration of justice must all be carefully and delicately weighed: but sitting as a court of review, we afford substantial discretion to the trial court in judging that balance, and we will not reverse absent a showing of a deprivation of the defendant's right.

189 U.S.App.D.C. at 331, 334, 584 F.2d at 489, 492 (internal footnotes and quotations omitted).

■ The factors relevant to a trial court's consideration in deciding whether to grant a continuance for new counsel include (1) whether other continuances have been requested or granted; (2) the inconvenience to the litigants, witnesses, and the court; (3) whether the request is dilatory or contrived; (4) the degree to which the defendant contributed to the delay; (5) whether the defendant has attempted to arrange for competent addi-

---

5. Shortly after his arrest on December 16, 1996, appellant was appointed counsel under the Criminal Justice Act by the Superior Court. On July 24, 1997, appellant's first request to substitute counsel was granted, based on appellant's representations that existing counsel was inadequate. Appellant, at that time, indicated his desire to hire his own lawyer. In the interim, the court appointed substitute counsel from the Public Defender Service, advising appellant that such a substitution would delay trial at least until December of 1997. Trial was eventually set for December 16, 1997. Due to a reassignment in the PDS, appellant's second counsel was permitted to withdraw on December 8, 1997, and appellant's case was reassigned to another PDS attorney. On December 16, 1997, appellant again requested new retained or appointed counsel. Trial was subsequently continued to the next day without counsel substitution. At no time has appellant indicated that between July 24, 1997, the date appellant first indicated his desire to hire counsel, and December 17, 1997, the beginning of his trial, he attempted to hire his own attorney, despite his indications otherwise.

tional counsel; (6) the degree of identifiable prejudice which would flow from the continuance; and (7) the complexity of the case. *See Yancey v. United States,* 755 A.2d 421, 427–28 (D.C.2000) (citing *Burton, supra,* 189 U.S.App.D.C. at 333, 584 F.2d at 491). A trial court need not explain its reasoning in detail, but rather need only "perceive [these] salient factors" when exercising its discretion.[6] *Burton, supra,* 189 U.S.App.D.C. at 339, 584 F.2d at 497.

Here, appellant indicated his wish for a new lawyer on the very day trial was to begin. Upon appellant's insistence for new counsel, the court conscientiously and appropriately held an inquiry, wherein the court sought appellant's reasons for desiring new counsel. Appellant first indicated that he was dissatisfied with his counsel because the PDS attorney was unprepared, but could give no specific basis for this belief.[7] He then said that he felt the attorney's status as a government employee biased the representation against him.[8] This comment represented appellant's first complaint on that basis, although beginning on July 24, 1997, he had been represented by a PDS attorney.

We recognize that appellant's dissatisfaction with counsel on account of pro-government bias could be regarded as applying more specifically to the new PDS attorney, rather than to the agency as a whole. But the trial court did not read it that way, and the record supports her understanding of appellant's complaint as attacking counsel's affiliation as such. In response to Leak's statements, the court told him that his PDS attorney was independent of the prosecutor's office and was "representing only you." Since Leak had identified no particular instances in which counsel "[took] on more than ... a lawyer's position" or sided with the government, the court reasonably perceived his dissatisfaction with counsel as entirely general in nature—of a piece with his later remark that counsel and he could not "even have any good conversations about the case"—and insufficient to require a continuance so that counsel could be replaced once more. *See Derrington v. United States,* 681 A.2d 1125, 1133 (D.C. 1996) (under the 6th Amendment, "[t]his court's standard of review is a deferential one.... We accept the judge's factual findings unless they lack evidentiary support, but we review his [or her] legal con-

6. Appellant's reliance on certain comments of the trial court as indicating a hobbled exercise of discretion overlooks the fact that these statements were made in the context of the full panoply of facts and circumstances known to the court which formed the explicit backdrop of the decision to deny appellant's request.

7. The court observed that appellant's newly appointed PDS attorney had received discovery from the government, that all appropriate motions had been filed, and that the attorney appeared "to know a great deal about the case."

8. Although defense counsel acknowledged that appellant's attitude affected the attorney-client relationship, the court was properly within its discretion to deny a continuance on this basis alone.

[I]n evaluating Sixth Amendment claims, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic,* 466 U.S. 648, 657, n. 21 [104 S.Ct. 2039, 80 L.Ed.2d 657] (1984). Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers. *See Morris v. Slappy,* 461 U.S. 1, 13–14 [103 S.Ct. 1610, 75 L.Ed.2d 610] (1983); *Jones v. Barnes,* 463 U.S. 745 [103 S.Ct. 3308, 77 L.Ed.2d 987] (1983).

*Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *see also United States v. Gallop,* 838 F.2d 105, 108 (4th Cir.1988) (holding where the trial court had previously found defense counsel competent, "the failure of the trial court to proceed further to resolve the issue [of whether the attorney-client relationship had entirely broken down] was not an abuse of discretion, especially [because] there [was] no evidence in the record to indicate that the question was reasserted during trial").

clusions *de novo.*") (quotations and citations omitted); *(James) Johnson v. United States,* 398 A.2d 354, 364 (D.C.1979) ("Generally [where the trial court has exercised its discretion] the factual record must be *capable* of supporting the determination reached by the trial court.") (emphasis added).

Appellant acknowledged to the court that he had not attempted to arrange for private counsel, despite his stated intentions to do so five months prior to the December trial date. See *supra* note 5. Moreover, the court found that appellant's counsel was a "capable, experienced attorney, fully capable of giving [appellant] effective representation." In addition, the trial court was aware of appellant's previous request (and the subsequent grant) for new counsel, the various delays in appellant's trial, and the fact that this was a non-aggravated robbery case. The next morning, appellant feigned illness, and again requested new counsel, prompting the trial court to note that "it appears obvious to the court that [appellant is] simply trying every technique to avoid this trial." [9]

Unlike the situation in *Yancey,* where the trial court erroneously exercised its discretion in denying a continuance for new counsel to prepare for a first-degree murder trial, there is no indication here that the court "failed to take into account other relevant factors and balance them against its desire to control its docket and have the case proceed to trial expeditiously." At 428–29. On the contrary, the hearing transcripts reflect adequate consideration of the merits of appellant's request, the preparedness of his appointed counsel, the prejudice to the orderly administration of justice, and the failure of

appellant to secure retained counsel despite adequate time to do so,[10] among other factors. In this context, the trial court did not abuse its discretion in denying appellant's request for a continuance to retain new counsel. *See Burton, supra,* 189 U.S.App.D.C. at 334, 584 F.2d at 492 (no abuse of discretion to deny continuance to retain counsel where request made on the date which was originally set for trial); *McGill v. United States,* 121 U.S.App.D.C. 179, 182–83, 348 F.2d 791, 794–95 (1965) (no abuse of discretion to deny continuance to replace appointed counsel with retained counsel where request made four days before trial and defendant failed to indicate he had retained competent counsel to represent him, despite six month opportunity to do so); *United States v. Turk,* 870 F.2d 1304, 1307 (7th Cir.1989) ("[g]iven ... the lateness of the request, the judge's accommodation of [appellant's] previous request for new appointed counsel, the presence of foreign witnesses, the adequacy and preparation of appointed counsel[,] the district court was well within its discretion in denying the continuance [for appellant to obtain new retained counsel]").

*Affirmed.*

GLICKMAN, Associate Judge, dissenting:

I agree with my colleagues that appellant Leak was not entitled to a lesser included offense instruction. I write separately, however, because I conclude that the trial court erred in compelling Leak to go to trial with an attorney whom he did not want to represent him. Through no fault of his own, Leak was appointed new counsel just nine days before his trial began. His relationship with that counsel

---

**9.** "A request for change in counsel cannot be considered justifiable if it proceeds from a transparent plot to bring about delay." *Gallop, supra,* 838 F.2d at 108 (citing *Morris, supra,* 461 U.S. at 13, 103 S.Ct. 1610).

**10.** It is true that appellant, through no choice of his own, had his court-appointed counsel replaced shortly before trial. Nonetheless, he

had opted to accept court-appointed counsel rather than retain his own counsel and his ultimate reason for dissatisfaction with his new counsel, at least by one reasonable reading, did not reflect a completely new and unforeseeable consideration arising out of the substitution.

quickly deteriorated, apparently over the question of whether Leak would plead guilty or insist on his innocence, to the point that counsel herself advised the trial court that communications had broken down and she could not effectively represent her client. Leak asked for an opportunity to retain counsel of his own choosing. In the circumstances before it, I think the trial court was required to grant that request, and its failure to do so deprived Leak of his Sixth Amendment right to engage counsel of his choice. I therefore respectfully dissent.

## I. BACKGROUND

The proper evaluation of Leak's Sixth Amendment claim depends on a full appreciation of the background and context of his request for permission to replace his newly appointed counsel with retained counsel. Hence it is necessary to recite the facts in some detail.

Leak was arrested on December 16, 1996. As he was on parole, Leak was detained for parole board action pending the outcome of his trial. That trial was originally scheduled for July 23, 1997, but was continued until the following day on account of a crowded court calendar. On July 24, 1997, the rescheduled trial date, the government asked Judge Henry F. Greene to continue the case for six weeks because the complaining witness, who was living in New York, required knee surgery. Leak then asked the court to replace his then-appointed counsel "[b]ecause this lawyer here hasn't done any investigation in the case, period, as far as the other person concerned. And to defend me properly, that I feel like I'm being helped. I'm not being helped properly."[1] Accepting that his request would necessitate a longer continuance than the government had sought, Leak stated that he intended to retain paid

counsel but nonetheless wanted the court to appoint new counsel in the meantime. Leak's counsel, who did not dispute Leak's complaints about him, moved to withdraw his appearance. Judge Greene granted the motion and appointed an attorney from the Public Defender Service (PDS) to represent Leak. Leak's trial was rescheduled for December 4, 1997. The trial date was subsequently deferred to December 16, 1997, in order to avoid a conflict with a judicial training conference.

So far as appears from the record, Leak was satisfied with his appointed attorney from PDS, and he did not carry out his expressed intention to retain counsel. But on December 4, 1997, Leak's PDS counsel moved to withdraw her appearance because she had been transferred to the appellate division of PDS. Her motion asked the court to appoint another PDS attorney as "substitute counsel," representing that this second PDS attorney had "been briefed on all matters and issues in this case" and would be prepared for trial on December 16, 1997. The motion stated that Leak had met his replacement counsel, understood "the need for counsel to withdraw and transfer his case," and had "no objection." The trial court granted the motion on December 8, 1997.

Eight days later, on December 16, 1997, Leak appeared with his newly appointed substitute counsel before Judge Greene. Counsel informed the court that Leak intended to enter a plea of guilty. At the outset of the court's Rule 11[2] inquiry, however, the following colloquy revealed that Leak was unwilling to plead guilty:

> THE COURT: Okay. Now, Mr. Leak, is it correct that you've decided to enter a plea of guilty in your case?
>
> DEFENDANT LEAK: Your Honor, I don't have any choice. Yes, yes, sir.

---

1. Leak further explained:
 I'm not getting proper help. You know, I really don't know what's going on. Keep prolonging it and stuff. You know, lawyer not letting me know everything that I need

to know. I feel like I'm being railroaded and I need some proper help. That's all.

2. Super. Ct.Crim. R. 11.

THE COURT: No, no, no, no. Yes, you do have a choice, sir. You can either plead guilty or you can go to trial. You have an absolute right to a jury trial in this case and indeed, I'm about to discuss that right with you extensively.

DEFENDANT LEAK: Okay.

THE COURT: So you do have an absolute right to go to trial. Do you want a trial in your case?

DEFENDANT LEAK: Do I want one?

THE COURT: Yes, a jury trial.

DEFENDANT LEAK: Yeah, yes, sir.

Based on Leak's responses, Judge Greene halted the Rule 11 inquiry and permitted Leak to confer privately with his counsel.

When the case was recalled, counsel reported that Leak did not wish to enter a guilty plea after all. Judge Greene thereupon informed the parties that Leak's trial would commence the next day.

At this juncture, Leak's counsel advised the court, "My client has stated that he may wish to seek retained counsel but that until he makes that decision, it's all right for me to continue working on the case." Judge Greene asked counsel for Leak and the government to come to the bench. Emphasizing that he did not wish to address Leak directly lest he appear to be pressuring Leak's decision, Judge Greene warned counsel that if Leak did choose to hire a new attorney to represent him, his trial might be delayed until March or April. Judge Greene asked defense counsel to so advise Leak if she thought it appropriate to do so. [*Id.*] The prosecutor remained silent during this discussion, saying nothing to indicate that the government would object to a continuance to allow Leak to retain new counsel.

On the next day, December 17, 1997, Leak's case was certified to another judge for trial. Defense counsel informed the trial court that Leak wanted new counsel. Taken by surprise, but noting that Leak had already had one change of counsel, the court asked Leak directly, "Is there anything about your counsel's representation that you think is ineffective?" Leak said that his counsel had failed to file necessary motions and was not ready to go to trial because she had just been assigned to his case. In the exchange that followed, Leak's counsel advised the court that she could not represent Leak effectively because her relationship with him had broken down "in light of yesterday and today"; but the court did not ask counsel to explain what had happened and, overlooking the constitutional dimension of Leak's request to retain counsel of his choice, summarily rejected that request based on the assumption that Leak was at fault:

THE COURT: Mr. [prosecutor], obviously, the appropriate motions have been filed. Are there, is there anything you want to say for the record about the—

[DEFENSE COUNSEL]: Yes, I would, your honor. I came into this case a couple weeks ago because a colleague of mine who went to the appellate division of our office. I believe that in light of yesterday and today, the extent of this relationship between Mr. Leak and myself, the extent to which it has broken down, I don't any [sic] Mr. Leak is going to talk to me, your honor. I don't any [sic] he's going to communicate with me. I just tried to talk to him in the back and I don't think he will deal with me in any context, well, in doing this case. I don't think that I can effectively represent him if he won't talk to me, and I—

THE COURT: All right. Mr. Leak, the keys to having adequate representation are in your hands. Miss [defense counsel] has gotten discovery from Mr. [prosecutor], colleagues of hers in the same office have prepared motions. She is a capable, experience[d] attorney, fully capable of giving you effective representation if you talk to her. We are about to select a jury for this case, and we will be beginning the trial tomorrow. And if you want your counsel to be able to represent you, you must talk to her. If not, it is your fault because she is a

capable attorney and the material is here for an effective representation. And you are entitled under the Constitution to have effective representation of counsel. You are not entitled under the Constitution to pick and choose your counsel or to have an attorney you like or to approximate able to dictate tactical judgments of counsel.

Leak then tried to explain why he wanted a new attorney, and he clarified that he intended to hire one himself rather than seek another appointed counsel:

THE DEFENDANT: The reason why I asked for new appointment of counsel is because it seemed like she took on more than just a lawyer's position. She took on a whole lot of positions, you know, pertaining to being within the government grounds. But I want my own lawyer. I don't want no lawyer from this branch, that is working in this government branch. I want my own lawyer. And I'm entitled to having my own lawyer.

THE COURT: If you have money to hire a lawyer here, you could have done that.

THE DEFENDANT: Yes, I do.

THE COURT: Then why didn't you do that?

THE DEFENDANT: I didn't have it. Now I do. I have it now.

The trial court again did not pause to inquire into the reasons why the relationship between Leak and his attorney had broken down. Instead, the court responded that "you can't make changes like that at the moment the government is ready for trial and has witnesses en route because the government has certain rights too." The court added that Leak's PDS attorney was independent of the prosecutor's office and was "representing only you." Leak insisted, however, that "I don't feel she's representing me to the best of her defense [sic]" and that Judge Greene had said he was entitled to hire a new lawyer. [*Id.*] But the court still opted not to inquire into

the reasons for Leak's dissatisfaction with his attorney, bluntly telling Leak that "[y]ou're not entitled to a lawyer of your choosings, and you cannot change lawyers just as we're about to start trial.... [E]very time there is a change of lawyers, there has to be a delay, and this trial is not going to be delayed."

At this point, Leak's counsel interjected that Judge Greene had not denied Leak's right to retain new counsel, but Leak had not been returned to Lorton from court the previous day in time to make arrangements to do so. Nonetheless, the court adhered to its ruling that Leak would have to stand trial with his unwanted attorney from PDS. The court expressed its firm conviction that "no judge" in Superior Court would allow a defendant to change his attorney on the day of trial unless the government consented:

In any event, the trial date was set for yesterday. No judge will allow you to change lawyers on the day set for trial unless the government consents. If the government is ready for trial and has its witnesses here and ready to go, you can't just say, oh, I just as soon another day because that's prejudicial to the government.

The attorney representing the government was, in fact, conspicuously silent throughout the argument over Leak's request to replace his attorney. The government never opposed Leak's request and never claimed that a continuance would be prejudicial.

When the case was recalled on the following day, Leak entered the courtroom unwillingly, telling the trial court that he was "feeling real paranoid, sick, nausea and everything. I'm not in no condition to be here." The court called for a nurse to attend to Leak's needs, and proceeded to hear pretrial motions. Leak's attorney then renewed Leak's request to obtain new counsel. The court stated that it had "heard nothing from [Leak] justifying a request for new counsel when everybody is ready to go to trial. It is, it seems obvious

to the court that you are simply trying every technique to avoid this trial." Leak said he was not trying to avoid trial, but reiterated that his recently appointed attorney was unprepared and that "we can't even have any good conversations about the case." Unmoved, and still without having inquired into the root of the problem, the court again denied Leak's request, and his trial got under way. The defense presented no evidence.

## II. DISCUSSION

As I view the record summarized above, the trial court failed to perceive the constitutional underpinnings of Leak's request for time to retain counsel of his choice, and failed to inquire into and evaluate the factors that it was required to consider. For these reasons I believe that the trial court did not exercise its discretion properly when it rejected Leak's request, and that Leak's conviction therefore cannot stand.

Turning first to the constitutional basis of Leak's request, "[w]hen an accused has the means to employ counsel, the Sixth Amendment right to counsel embraces not only the assistance of counsel but also the reasonable opportunity to secure counsel of one's own choice." *Harling v. United States,* 387 A.2d 1101, 1104 (D.C.1978) (citing *Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932)); *see also Douglas v. United States,* 488 A.2d 121, 141 (D.C.1985); *United States v. Burton,* 189 U.S.App.D.C. 327, 330–31, 584 F.2d 485, 488–89 (1978).[3] The right to hire

counsel of one's choice derives, this court has explained, from two related constitutional norms. First, the right "to select counsel free from undue interference by the court is an essential corollary of the express right to the assistance of counsel under the Sixth Amendment" because, in the adversary system, the attorney serves as the "personal agent" of the litigant and not as an agent of the state. *Douglas,* 488 A.2d at 141. Second, the defendant's due process right to make decisions "central to the defense" necessarily encompasses the choice of representative in the courtroom.[4] "Because the selection of an attorney is often 'the most important decision a defendant makes in shaping his defense,' [*United States v. Laura,* 607 F.2d 52, 56 (3rd Cir.1979) ], we conclude that a defendant's choice of counsel is among the fundamental defense decisions constitutionally protected under *Faretta*[5] and *Frendak.*[6]" *Douglas,* 488 A.2d at 142.

Importantly, the right to one's choice of counsel is distinct from the right to effective assistance of counsel; and securing the latter right does not obviate the need to honor the former as well. *See Burton,* 189 U.S.App.D.C. at 331 n. 10, 584 F.2d at 489 n. 10. Rather, if an attorney is imposed on a defendant against his will, the absence of a confidential, trusting relationship may compromise the attorney's ability to be an effective advocate.

The right to retain counsel of choice is not, however, an unqualified right. The

---

3. Defendants who do not have the means to employ counsel "may not insist on representation by an attorney [they] cannot afford...." *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). The trial court has "wide latitude in appointing counsel for indigent defendants." *Douglas,* 488 A.2d at 144 n. 32. "Once a valid appointment is made and an attorney-client relationship has been established, however, an indigent defendant has precisely the same right to insist upon continued representation as does a defendant who retains counsel." *Id.; see also Harling,* 387 A.2d at 1105 (court may not arbitrarily remove appointed counsel).

4. Courts have also located the roots of the right to counsel of choice in the due process clause of the Fifth Amendment. *See Powell,* 287 U.S. at 66–68, 53 S.Ct. 55; *United States v. Friedman,* 270 U.S.App.D.C. 359, 361, 849 F.2d 1488, 1490 (1988); *Burton,* 189 U.S.App. D.C. at 332, 584 F.2d at 490; *Douglas,* 488 A.2d at 142.

5. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

6. *Frendak v. United States,* 408 A.2d 364 (D.C. 1979).

public's interest in the "prompt, effective, and efficient administration of justice" may constitute a countervailing consideration that justifies limiting a defendant's exercise of this right. *Burton,* 189 U.S.App. D.C. at 331, 584 F.2d at 489; *accord, Harling,* 387 A.2d at 1104 ("The only limitation that may be placed on the right to retained counsel of choice is that the client's selection not impede or disrupt the orderly administration of justice."); *see also Douglas,* 488 A.2d at 143 (furnishing examples of when concerns for the proper administration of justice may override defendant's right to hire counsel of his own choosing).

In this case, Leak sought a continuance on the day set for trial so that he could replace his recently appointed counsel, in whom he lacked confidence, with retained counsel. The trial court has broad discretion to grant or deny a continuance, and our review is deferential. *See Burton,* 189 U.S.App.D.C. at 332, 584 F.2d at 490; *Douglas,* 488 A.2d at 142. "Yet when the continuance is sought to retain or replace counsel, the defendant's Sixth Amendment right to the assistance of counsel is implicated. In such circumstances, the right to select counsel must be carefully balanced against the public's interest in the orderly administration of justice." *Burton,* 189 U.S.App.D.C. at 331, 584 F.2d at 489 (footnote omitted); *see also United States v. Gonzalez,* 113 F.3d 1026, 1028–29 (9 th Cir. 1997); *Fuller v. Diesslin,* 868 F.2d 604, 610–11 (3 rd Cir.1989); *United States v. Johnston,* 318 F.2d 288, 291 (6 th Cir.1963).

As the *Burton* court elaborated, and as my colleagues in this case agree, the factors which the trial court should consider in the balance include (1) "whether other continuances have been requested and granted"; (2) "the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court"; (3) "whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived"; (4) "whether the defendant contributed to the circumstance which gives rise to the request for a continuance"; [7] (5) whether the defendant has arranged, or attempted to arrange, for "other competent counsel prepared to try the case"; (6) the extent of "identifiable prejudice" to the prosecution or to the defendant from granting or denying the continuance; [8] and (7) the complexity of the case. *Burton,* 189 U.S.App.D.C. at 332–33, 584 F.2d at 490–91.

The majority opinion finds that the trial court adequately considered these factors. Upon my examination of the record, I am constrained to disagree. After satisfying itself that Leak could not identify any specific respect in which his PDS attorney was unprepared for trial, the court gave short shrift to Leak's interest in retaining counsel of his own choice rather than being represented by newly appointed counsel whom he did not trust. The court denied Leak's request solely because granting it would delay the trial and thereby inconvenience the prosecution and its witnesses, regardless of other considerations. [9] This

---

7. Or, as the majority opinion puts it, "the degree to which the defendant contributed to the delay." *Ante* at 744.

8. In *Burton* the court stated this factor as "whether *denying* the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature," 189 U.S.App.D.C. at 333, 584 F.2d at 491 (emphasis added). In its listing of relevant factors, the majority in this case focuses on the prejudice (presumably to the prosecution) from *granting* the continuance. *Ante* at 744–45. I think that identifiable prejudice to either side from granting or denying the continuance is relevant and should be considered.

9. In the following statements the trial court left no doubt about the rationale for its rulings:

"[Y]ou can't make changes like that at the moment the government is ready for trial and has witnesses en route because the government has certain rights too."
"You're not entitled to a lawyer of your choosing, and you cannot change lawyers just as we're about to start trial."
"[E]very time there is a change of lawyers, there has to be a delay, and this trial is not going to be delayed."
"No judge will allow you to change lawyers on the day set for trial unless the government consents. If the government is ready

was the categorical invocation of a *per se* rule, not the discretionary balancing of factors that was constitutionally mandated. "Failure to exercise choice in a situation calling for choice is an abuse of discretion—whether the cause is ignorance of the right to exercise choice or mere intransigence—because it assumes the existence of a rule that admits of but one answer to the question presented." *Johnson v. United States,* 398 A.2d 354, 363 (D.C.1979). It is easy to sympathize with the trial court's consternation when Leak sought to replace his attorney on the day of trial. The court's reluctance to grant that request in light of the delay and inconvenience it would entail is understandable; such last minute requests are disfavored. Nonetheless, I think that the court's inquiry was insufficient to sustain its ruling. *See Johnson,* 398 A.2d at 366–67 ("if the court failed to undertake a required factual inquiry or if it ignored an apparent deficiency in the record, reversal is appropriate").

My evaluation of the seven relevant *Burton* factors enumerated above convinces me that the court should have granted Leak's request.

*Prior Continuances.* The first *Burton* factor is whether other continuances were requested or granted. So far as appears from the record, this was not a factor that the trial court took into consideration. In addition to brief continuances necessitated by the court's calendar, there was one significant continuance of Leak's trial, from July to December. This continuance was requested, initially, by the government, because the complaining witness needed surgery. Leak then complained that his first appointed counsel had failed to conduct pretrial investigation or under-

take to defend him properly. Judge Greene granted the continuance to accommodate the complaining witness and to afford Leak's replacement counsel sufficient time to prepare for trial. Leak remained incarcerated on a parole hold during the interim. I do not see how this continuance can be said to weigh against Leak's subsequent request for a continuance to retain counsel. Leak bore no responsibility for the complainant's need to have surgery, and there is nothing to suggest that Leak's complaint against his first appointed counsel was a sham. Leak cannot be faulted for insisting on his Sixth Amendment right to effective counsel. It is true that Leak did not use the continuance granted in July to retain paid counsel as he said he would. But if Leak was satisfied with the first attorney from PDS who was appointed to represent him, he had no reason to replace her. The salient fact is that after Leak's second PDS attorney was appointed, there were no continuances and Leak had no meaningful opportunity in which to retain alternative counsel. Leak's failure to utilize the July continuance to replace his second PDS attorney with retained counsel therefore cannot rationally be held against him.

*Inconvenience.* The second *Burton* factor instructs the court to consider inconvenience to the litigants, witnesses, counsel or the court. The trial court made no inquiry into the extent of such inconvenience. I do not doubt that granting Leak's request would have been somewhat inconvenient for all concerned. The government had its witnesses available, and the complaining witness had to travel from New York in order to testify. If the court

for trial and has its witnesses here and ready to go, you can't just say, oh, I just as soon another day because that's prejudicial to the government."
The majority opinion opines that "these statements were made in the context of the full panoply of facts and circumstances known to the court which formed the explicit backdrop of the decision to deny appellant's request." *Ante* at 745 n. 6. I do not agree. As I discuss

*infra,* the record demonstrates that "the full panoply of facts and circumstances" was *not* "known to the court" and was *not* an "explicit backdrop" of its decision. For example, the trial court could not know, because it did not ask, why Leak's relationship with his second PDS attorney had collapsed, or whether the government would in fact be prejudiced by a continuance.

had postponed the trial, these witnesses would have been asked to make a return trip to the courthouse. That imposition on their time was undesirable, but its seriousness should not be exaggerated. The government did not complain of inconvenience and did not object to a continuance, either before Judge Greene or the trial judge. The government needed to call only two witnesses in addition to the complainant, and both of them were local: a Metropolitan Police Department officer and a civilian witness who happened to be watching from the balcony of her apartment as the complainant chased Leak. On the record before it, the trial court had no basis to presume that the government and its witnesses would have been more than minimally inconvenienced if the trial were continued. A continuance would have been significantly more inconvenient for Leak, because it would have lengthened the duration of his pretrial incarceration on the parole hold. But Leak was prepared to pay that price. The upshot is that inconvenience, though present in this case, was not sufficient to justify denial of Leak's Sixth Amendment right to retain counsel of his choice.

*Dilatory or Contrived.* On the record before the trial court, Leak's request to retain new counsel cannot fairly be characterized as dilatory or contrived, the third *Burton* factor. Leak was not terribly articulate, but he made it clear enough—and his attorney confirmed—that their relationship had deteriorated, and he simply wanted to be represented by an attorney with whom he could communicate and who did not appear (to him) to be biased in favor of the government.[10] Although the

trial court did not inquire into the reasons for the breakdown in the attorney-client relationship, what happened is not difficult to discern in broad outline. As Leak's counsel told the trial court, her relationship with Leak disintegrated "in light of yesterday and today." On the preceding day, December 16, counsel had informed Judge Greene that Leak was ready to enter a plea of guilty. But Judge Greene's Rule 11 colloquy with Leak revealed that Leak felt he had been coerced. The plea proceeding collapsed, and shortly thereafter counsel notified the court that Leak might retain counsel to replace her. In this context, it is evident that the thrust of Leak's statements to the trial court the next day was that Leak distrusted his attorney because (he felt) she had pressured him into pleading guilty against his will, as if she were working for the government rather than for him. And Leak apparently felt strongly and sincerely enough that his counsel "took on more than just a lawyer's position" and was not "representing me to the best of her defense" that he was willing to extend his pretrial incarceration and pay for an attorney in whom he would have confidence.

I perceive no basis in Leak's statements to the court or the record as a whole for a finding that Leak's motive in seeking to retain new counsel was merely to delay his trial or otherwise obstruct the administration of justice. Indeed, since Leak was incarcerated, he had no obvious incentive to delay.[11] The majority opinion seizes, however, on Leak's comment that he did not want an attorney associated with the government (i.e., PDS) to posit that his request for new counsel was contrived,

10. In response to the court's questions, Leak also expressed anxiety about his attorney's preparedness. Since she had been on the case little more than a week, and necessarily relied on the pretrial work of her predecessor, his anxiety was understandable. I agree that Leak did not substantiate his charges of inadequate preparation. But as discussed above, Leak's concerns were not limited to (or even primarily related to) his counsel's preparedness.

11. The record does not establish whether Leak's illness at the start of trial (after his request for new counsel was denied) was feigned as the trial court suspected. All we know from the record is that a nurse was called to attend to Leak's needs, and the trial later got under way. But even if Leak was not really feeling ill, that alone would not flag his request for new counsel as dilatory.

inasmuch as Leak made no complaint of pro-government bias when another PDS attorney represented him between July and December. *Ante* at 745. With respect, I think the majority opinion misconstrues what Leak actually said. In the course of his remarks, Leak did say that he did not want a lawyer from "this government branch [i.e., PDS]"; but he *did not* say, as the majority opinion puts it, that he was dissatisfied because "he felt the attorney's status as a government employee biased the representation against him." *Ante* at 745. On the contrary, Leak explained that "[t]he reason why I asked for new appointment of counsel is because it seemed like she took on more than just a lawyer's position. She took on a whole lot of positions, you know, pertaining to being within the government grounds." Leak further said that "I don't feel she's representing me to the best of her defense [sic]" and that he was not able to communicate with his attorney about the case. In other words, the reason that Leak explicitly gave for his dissatisfaction with his current attorney applied specifically and only to her and was based on his perception of her performance, not her "governmental" affiliation. The larger context of Leak's statements, including his counsel's elaboration, confirms that Leak's dissatisfaction arose in connection with his counsel's advice to plead guilty.

Thus I also disagree with the majority's conclusion that the trial court reasonably understood Leak's complaint to be merely the generic one that his attorney was affiliated with a government agency. *Ante* at 745. If that is what the trial court understood (which I doubt [12]), then the trial court came to that understanding upon insufficient inquiry and without attending to what Leak and his counsel actually said.

*Defendant's Contribution to the Delay.* It follows from what is said above that the fourth *Burton* factor, the defendant's contribution to the delay (or to the circumstance giving rise to his request for a continuance to retain new counsel), favors Leak. Leak's second PDS attorney was appointed to represent him on December 8, 1997. The grounds for Leak's request to replace her did not arise until some time after that date, apparently on or about December 16 (the date of the guilty plea proceeding). Leak could hardly have acted more expeditiously than he did. Moreover, since the withdrawal of his first PDS attorney was due to circumstances beyond his control, that withdrawal was "clearly not chargeable to [Leak] and cannot be made the occasion for denying him his constitutional right to counsel of his own choosing." *Lee v. United States*, 98 U.S.App.D.C. 272, 274, 235 F.2d 219, 221 (1956). [13] And there was no showing that Leak himself was to blame for the breakdown of his relationship with his second PDS attorney.

Had Leak's second PDS counsel been appointed four months, rather than nine days, before trial, there can be no question that Leak would have had the right to retain private counsel to replace her if he acted as promptly as he did in this case. The fact that, through no fault of Leak's, the second PDS counsel did not enter the picture until shortly before trial should not affect the outcome.

*Efforts to Arrange for Substitute Counsel.* The fifth *Burton* factor, whether the defendant had attempted to arrange for substitute counsel, overlaps with the preceding factor. It does not weigh against granting Leak's request. Leak's failure to arrange for substitute counsel is excusable given how little time he had to do so after

12. Indeed, I do not think that the trial court's understanding, if any, of the basis of Leak's dissatisfaction with his PDS attorney can be ascertained from the record before us, given the inadequacy of the court's inquiry.

13. Thus, contrary to the implicit suggestion in the majority opinion, *ante* at 744, Leak did not waive his right to retain private counsel of his choice by accepting representation by the first PDS attorney. So far as appears, that first PDS attorney *was* counsel of Leak's choice.

his second PDS attorney was appointed and the disruption of their relationship occurred. Moreover, as that attorney advised the trial court, Leak's pretrial incarceration and his delayed return to Lorton from court on December 16 after the plea proceeding prevented him from making arrangements to retain a new attorney. As noted above, Leak's failure to arrange for private counsel in the period before his second PDS attorney was appointed does not count against him because he cannot be faulted for not replacing an attorney whom he found satisfactory, i.e., his first PDS counsel.

*Identifiable Prejudice.* The sixth *Burton* factor examines the degree of identifiable prejudice which would result from granting or denying a continuance. The trial court *assumed* that the prosecution would be prejudiced if a continuance were granted. However, the court made no inquiry regarding potential prejudice to the prosecution, and counsel for the government did not proffer that it would suffer any prejudice. Aside from the inconvenience discussed above, which may fairly be called modest on this record, no "identifiable prejudice" to the prosecution is apparent.[14]

On the other hand, Leak and his counsel did make some showing of prejudice to the defense from the denial of a continuance.[15] In brief, his counsel represented that, because of the breakdown in their relationship, she and Leak were not communicating and "I don't think that I can effectively

represent him if he won't talk to me." The trial court dismissed this concern. Without exploring the cause of the breakdown, the court proceeded to lecture Leak that "if you want your counsel to be able to represent you, you must talk to her. If not, it is your fault because she is a capable attorney and the material is here for an effective representation." I do not think this was an adequate response to the problem that confronted the court. On the state of the record the trial court was not in a position knowledgeably to apportion "fault" between Leak and his attorney or to dispute the assessment by Leak's attorney that her effectiveness was impaired. Due consideration of identifiable prejudice in this case would thus have supported granting a continuance to allow Leak to retain new counsel.

*Complexity of the Case.* The seventh *Burton* factor, the complexity of the case, also weighs in favor of a continuance.[16] The trial court did not undertake to consider this factor. However, because this was a simple case for the prosecution to present, involving only three prosecution witnesses, the likelihood that a continuance would prejudice the prosecution was diminished. Furthermore, the simplicity of the case—combined with the fact that prior defense counsel had already obtained discovery, conducted investigation, filed motions and otherwise prepared for trial—meant that only a brief continuance was needed to accommodate Leak. Although the trial court did not inquire into how

---

14. Unnecessary delay of trial is contrary to the public interest in every case because as cases get old, memories may fail, witnesses and evidence may become unavailable, and other, comparable problems may arise (as, in this case, loss of defense counsel). For these reasons, which may affect both the prosecution and the defense, I do not discount the importance of avoiding unnecessary delay. These general concerns, applicable to every case, do not suffice to constitute the case-specific "identifiable prejudice" which the court should consider. Deferral of trial in the instant case, which was only a year old at the time of trial, did not, so far as the record shows, pose any special risks.

15. "A showing of prejudice to the defendant's case is not a prerequisite to the granting of a continuance. However, if some prejudice is identifiable, that finding would lend weight toward granting the requested continuance." *Burton,* 189 U.S.App.D.C. at 333 n. 19, 584 F.2d at 491 n. 19 (citation omitted).

16. If the issue were whether Leak's counsel could be effective despite the recency of her appointment, the lack of complexity of this case would suggest that she could. But that is not the issue.

long a continuance would be necessary, if the court was satisfied that Leak's second PDS attorney could prepare for trial on just a few days' notice, it should have been satisfied that a privately retained attorney could do the same.[17]

In my view, then, the trial court did not exercise sound discretion when it rejected Leak's request to retain substitute counsel. On the record before us, a proper application of the factors enumerated above—the "careful balancing" which the court eschewed in favor of the categorical principle that "[n]o judge will allow you to change lawyers on the day set for trial unless the government consents"—would have led to a different outcome. Because the trial court did not properly determine that "the public's interest in the orderly administration of justice"[18] outweighed Leak's interest in selecting counsel of his own choosing, I am constrained to conclude that Leak's Sixth Amendment right was violated.

The deprivation of Leak's constitutional right to retain counsel of choice cannot be deemed harmless merely because we might conclude that Leak was competently represented at trial. "Obtaining reversal for violation of such a right does not require a showing of prejudice to the defense, since the right reflects constitutional protection of the defendant's free choice independent of concern for the objective fairness of the proceeding." *Flanagan v. United States,* 465 U.S. 259, 268, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984); *see also Harling,* 387 A.2d at 1106 (finding that it is "irrelevant that substitute counsel has not been shown to have performed ineptly" and that "[r]eversal is required even though no prejudice is shown"). Thus, "if the trial judge denies a request for a continuance where it would have been fair and reasonable to have done so to enable the defendant to retain or substitute counsel, and

thereby violates the defendant's Sixth Amendment right, the violation is made out, and harmless error tests do not apply." *Burton,* 189 U.S.App.D.C. at 333 n. 19, 584 F.2d at 491 n. 19.

For the reasons stated above, I would vacate Leak's conviction and remand for a new trial.

---

**17.** It is not always so easy to fit a brief continuance to the court's busy calendar, but it is certainly easier to do so if the trial promises to be short.

